NOT DESIGNATED FOR PUBLICATION

No. 113,093

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of

Z.J.,
YOB 2007, Male

Z.M.,
YOB 2011, Female.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JEFFREY SYRIOS, judge. Opinion filed October 9, 2015.
Affirmed.

*Michael E. Lazzo*, of Wichita, for appellant natural mother.

*Julie A. Koon*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before MALONE, C.J., ARNOLD-BURGER, J., and JOHNSON, S.J.

*Per Curiam*: T.J. (Mother) appeals the termination of her parental rights to her children, Z.J. and Z.M. She contends that the district court's findings resulting in that termination are not supported by clear and convincing evidence. We disagree and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Mother and J.E. had a son, Z.J., who was born in 2007. Shortly after Z.J. was born, Mother left J.E. and became involved in a relationship with P.M. Mother's sister had a daughter, R.J., born in 2005, and a son, N.J., born in 2007, who left that sister's home

1

and, in 2008, began to reside with Mother, P.M, and Z.J. Mother and P.M. then had a daughter, Z.M., who was born in 2011.

On September 25, 2012, 5-year-old N.J. arrived at school. He told his teacher he did not want to sit down because his buttocks and hip hurt from a "whoopin" P.M. had administered the previous day. School personnel notified the Department for Children and Families (DCF). DCF's investigator went to the school and discovered severe bruising on N.J.'s back, buttocks, arms, legs, and neck. The police then took Z.J., Z.M., N.J., and R.J. into protective custody while they investigated the cause of N.J.'s injuries. N.J. reported that P.M. had beaten him with a belt for failing to complete his schoolwork.

On September 28, 2012, the State filed a verified petition alleging that Z.J. and Z.M. were children in need of care. In the CINC petition, the State alleged that Z.J. and Z.M. had been physically, mentally, or emotionally abused or neglected; were without adequate parental care, control, or subsistence and the condition was not due solely to the lack of financial means; were without the care or control necessary for the children's physical, mental, or emotional health; and had been residing in the same residence with a child who had been physically, mentally, or emotionally abused or neglected.

The State specifically alleged, among many things, that P.M. had reportedly beaten N.J. while Mother was at work; N.J. suffered numerous belt wounds, described in graphic and precise detail, from his legs all the way up to his neck; P.M. denied the beating and claimed he did not know how N.J. was injured; Mother claimed to the authorities that she was home all day with N.J. on September 24, 2012, to see that he finished his homework; Mother refused to believe that P.M. had beaten the child in spite of the child's obvious injuries; and Z.J., R.J., and N.J. all reported that P.M. had administered "whoopins" to N.J. and R.J. on prior occasions. The State further alleged that the children were not safe with Mother because, in addition to condoning or ignoring P.M.'s extreme forms of "discipline," P.M. and Mother had an extensive history of

2

domestic violence between each other. Further, Mother had a history of domestic violence with other men, including J.E., violence involving other women, and 6 prior misdemeanor convictions. The State alleged it was concerned that Mother may have mental health issues as she reportedly (from prior DCF investigations) had been diagnosed with bipolar disorder, schizophrenia, and depression. Finally, Mother had a prior drug conviction.

That same date, September 28, 2012, the district court placed temporary custody of the children in DCF. It ordered Mother not to discuss the case with her children unless it was in a therapeutic setting and to refrain from the use of illegal drugs and the abuse of alcohol, undergo a clinical interview and assessment, attend domestic violence classes, attend parenting classes, maintain employment and provide pay stubs to the assigned case worker, maintain appropriate housing, participate in supervised visitation with her children, and obtain an I.D. card or driver's license with proof of insurance.

On November 15, 2012, Z.J. was adjudicated a child in need of care regarding his father, J.E., who was in default after publication service. On December 13, 2012, the district court adjudicated Z.J. and Z.M. as children in need of care after Mother and P.M. waived an evidentiary hearing and declined to contest the allegations in the petition. The district court ordered that the children remain in DCF custody so that a program of reintegration could be developed and implemented. The court left its prior orders in place and further ordered that mother immediately submit to urinalysis and hair follicle testing within 7 days. The court made an electronic record of the proceeding and admitted numerous documents into evidence. Neither a transcript of the hearing nor the exhibits are in the record on appeal.

Collaterally, the State charged P.M. with felony aggravated battery regarding N.J. and felony aggravated child endangerment regarding R.J. It also charged Mother with

3

two counts of misdemeanor child endangerment for permitting N.J. and R.J. to be placed in situations where they could be beaten by P.M.

On February 14, 2013, the district court conducted a permanency review hearing. Mother appeared with counsel. Youthville, DCF's designee agency coordinating permanency planning, appeared by its various workers. The court specifically ordered Mother into individual counseling. Further, Mother, who had no driver's license, was ordered to have someone else drive her where she needed to go. The court also left in place its prior orders.

On April 11, 2013, the court conducted another permanency review hearing. Mother was again ordered to "commence" her individual counseling program.

On June 3, 2013, the court conducted another permanency review hearing. Mother appeared but was excused to go to a proceeding in her criminal case. The court made no new orders for Mother but left its prior orders in place.

On August 26, 2013, the court conducted another permanency review hearing. The journal entry indicates that at some time after the June hearing Saint Francis Community Services (SFCS) replaced Youthville as DCF's designee to coordinate supervision of the case. The court made no new orders for Mother but left its prior orders in place.

On September 13, 2013, the district court reduced Mother's child support to $25.00 per month.

On October 21, 2013, the court conducted another permanency review hearing. The journal entry indicates that Mother had pled to 2 counts of endangering a child on September 6, 2013, and received probation for 6 months. Further, it noted that on July 8, 2013, P.M. had pled guilty to felony aggravated battery and a count of misdemeanor

4

endangering a child. P.M. was placed on probation for 24 months. Finally, it confirmed that Mother had been evaluated by Dr. Joseph Donaldson, whose report was dated February 4, 2013. The doctor was purportedly providing Mother individual therapy. The journal entry states that, in the doctor's evaluation report, Mother did "'not voluntarily discuss or admit to any abuse or neglect of her children'" nor did she explain the reason the children were removed from her custody. The court left its prior orders in place.

On December 19, 2013, the court conducted another permanency review hearing. The journal entry indicates that the district court and parties considered, among other things, a report from SFCS caseworker Jack Phelps, a report on Z.J.'s therapy from his counselor, Jeanine Jantz, and a health assessment and treatment plan regarding Mother from Dr. Donaldson dated November 11, 2013. The court left its prior orders in place.

On March 12, 2014, the court conducted another permanency review hearing. Among many documents considered, the journal entry notes that the court and parties received COMCARE's treatment records regarding Mother. The district court, in anticipation of the State's filing of a motion to terminate Mother's and P.M.'s parental rights, set a termination hearing for May 19, 2014. However, the court also ordered SFCS to craft an achievement plan within 7 days listing tasks that would assist Mother and P.M. in completing their court orders to rehabilitate the reintegration plan. The court left its prior orders in place. In addition, Mother was ordered to submit to drug testing.

The court made an electronic record of each permanency review hearing and admitted numerous documents into evidence which are listed in the respective journal entries from those hearings. No transcripts of those hearings are in the record on appeal, nor are any of the documents.

On April 14, 2014, the State filed a motion to terminate the parental rights of Mother and Z.J.'s and Z.M.'s fathers. With regard to Mother, the motion included

5

allegations (1) that Mother committed physical, emotional, or sexual abuse by failing to protect her children from witnessing physical abuse of other children in the home and failing to protect the other children from abuse; (2) that Mother committed physical, mental, or emotional abuse or neglect by failing to maintain a safe and stable living environment, failing to prevent her children from witnessing abuse, and failing to protect other children in the home; (3) that Mother failed to modify her lifestyle to provide appropriate care for her children, took excessive time to complete court orders, and continued to defend P.M.'s abusive conduct, despite reasonable efforts by social service agencies to rehabilitate the family; (4) that Mother failed to adjust her circumstances, conduct, or condition to meet the needs of her children by refusing to make long-term changes, to modify her lifestyle, including the continued use of drugs, and to complete the court orders; (5) that Mother failed to assure the care of her children when able to do so by failing to maintain a safe and stable living environment; and (6) that Mother failed to carry out a reasonable court-approved plan for reintegration by failing to modify her lifestyle, failing to complete court orders, and continuing to defend P.M.'s conduct.

On May 19, 2014, the date of the scheduled termination hearing, the court concluded that P.M. had not been given proper notice because the State had mailed service to his residence when he was actually in the county jail. The court continued the termination hearing to permit the State to obtain proper service on P.M. Because the issues in P.M.'s case were closely intertwined with issues in Mother's case, the court also granted a continuance to Mother. Based on J.E.'s failure to appear, the district court accepted the State's proffer of evidence and found clear and convincing evidence of J.E.'s unfitness and terminated his parental rights to Z.J. By agreement, the district court heard the testimony of two witnesses regarding Mother's therapy.

Kevin Waymire testified that he was a student therapist at HopeNet working to obtain his master's degree in marriage and family therapy. He was assigned to conduct individual therapy with Mother under the supervision of Jennifer Armstrong. Waymire

6

conducted his first session with Mother on February 27, 2014, with additional sessions occurring March 6, March 13, April 3, and May 1. Mother was a late cancellation for the scheduled March 27 session, and a "no-show" for appointments scheduled April 10, April 17, and May 8.

Waymire gauged Mother's commitment to therapy as a 2 1/2 to 3 on a five-point scale. Mother told him that the goals of her therapy were to improve her ability to maintain employment and obtain adequate housing. He diagnosed Mother as suffering from major depressive disorder, but he had not yet developed a treatment plan. He did expect that long-term therapy would be required. He acknowledged that Mother had failed to tell him that she had a history of drug use, that she was currently on probation, or that she had been sexually abused when she was a child. He agreed that these omissions were significant. Waymire said Mother claimed that she had left P.M. 4 days before her first therapy session. However, she subsequently failed to tell him they were back together. Waymire believed that a major factor in Mother's depression was that her children were not in her custody. He confirmed that medications for Mother's depression had been prescribed for her, but Mother told him she could not afford them. To Waymire's knowledge, Mother did not ask for help in obtaining her prescriptions.

Jennifer Armstrong then testified. She was a therapist at HopeNet and supervised Waymire during his internship there. She confirmed that Mother had been discharged from HopeNet treatment because of her excessive no-shows. However, she testified that Mother would be permitted to resume her therapy at HopeNet if she signed a new contract making a clear commitment to attend her sessions.

The district court rescheduled the remainder of the termination hearing for July 8, 2014. Later, the hearing was further continued until September 2, 2014.

7

On September 2, 3, and 16, 2014, the district court heard all of the remaining witnesses testify on the State's termination motion.

Jeanine Jantz, a licensed clinical professional counselor, testified that she was the therapist for Z.J. She first saw him on November 15, 2012. She initially diagnosed Z.J. with physical abuse of a child. Jantz testified that she uses a play therapy approach to treat young children because their verbal skills are limited. Observing Z.J.'s play she saw what would be consistent with his witnessing or possibly being a victim of child abuse. She said she had concerns with his aggressive play when she began to see him. Z.J.'s play had made a positive transition over time after his placement in a stable foster care home and his bonding with his foster parents. Jantz said Z.J. recently was exhibiting empowerment and mastery play which are signs of improvement. Jantz attempted to get Z.J. to verbalize his hesitation about visitation with Mother, but he became guarded, so she abandoned that verbal approach. Jantz said she could not recommend family therapy until Mother's home life stabilized, but Mother continued to move in with and then move away from P.M. These moves indicated a lack of the stability Z.J. needed.

Luree Lusk testified that she was an advanced practice registered nurse employed by COMCARE. She conducted a medication evaluation of Mother February 28, 2014. Mother told Lusk that she had been living in a truck because someone had shot into the house where she had been residing. During the evaluation Lusk discussed with Mother the history of her current illness, her past psychological history, her medical history, previous and current medications, her alcohol and drug history, and her legal and social histories. Mother acknowledged that she had been sexually abused when she was a youth by her sister's father. Mother recently had been unemployed for a month and was selling her plasma to obtain money. Mother admitted the use of alcohol and marijuana but stated she was currently in an outpatient substance abuse program. Lusk prescribed trazodone and Wellbutrin for Mother's depression, based on her interview and a prior diagnosis of

8

PTSD, cannabis abuse, and personality disorder made by Brian Kerschen of COMCARE. Lusk said that Mother was a no-show regarding follow-up medication visits.

Brian Kerschen testified that he was a licensed master's level social worker employed by COMCARE. He performed a mental health intake and assessment on Mother on February 7, 2014. Kerschen said Mother identified marijuana as her drug of choice although she admitted that, far in her past, she had tried cocaine and methamphetamine. Kerschen explained the contents of his written evaluation, which contained his diagnosis that Mother suffered from PTSD, bipolar disorder, cannabis abuse, and personality disorder. Kerschen recommended that Mother obtain individual therapy, which COMCARE was not providing at the time, at HopeNet. Mother told Kerschen that she was willing to participate in that therapy and take her medications. However, Kerschen noted that Mother had missed the last three "med appointments" that had been scheduled for her.

Jennifer Armstrong of HopeNet, who had testified at the May 19, 2014, proceeding, was recalled by the State. She said that on May 20 she called Mother's attorney and the SFCS caseworker, Jessica Duntz, to inform them that Armstrong would accept Mother back into individual therapy so she could prepare for the July hearing. Apparently neither counsel nor Duntz made prompt contact with Mother to make the necessary arrangements to resume therapy, nor did Mother call Armstrong to see if she could get back into treatment. Mother eventually called Armstrong on July 18, 2014, and stated her desire to resume counseling. They set up weekly Thursday appointments to commence July 24, 2014, at 10 AM. Armstrong emphasized to Mother that she would be required to pay for her sessions. Mother called and canceled that first session because she was required to be in court on her criminal case. She did not appear for the following Thursday sessions. Armstrong attempted to contact Mother, but apparently the phone number she used was invalid. Mother finally called Armstrong on August 13, 2014. They arranged an appointment for August 21, 2014.

Mother kept that appointment but said she did not have the money to pay for the session. Mother told Armstrong she would pay the next day when she got her paycheck, but she did not. Mother returned for her August 28, 2014, appointment but again said she could not pay. This time Mother said that she had been recently hospitalized and her paycheck was short because she did not work the hours she usually worked. Armstrong refused to provide a therapy session. Mother became upset and told Armstrong: "I don't need to be here." Armstrong replied that she believed that Mother needed the therapy for court. Mother did not return for any further therapy at HopeNet.

Jack Phelps said he had become the SFCS caseworker for the family on July 1, 2013. He promptly attempted to make contact with Dr. Donaldson, the initial therapist for Mother, but was unable to actually reach him until October 2013. Phelps requested a comprehensive update on the therapy. He received only a general response from the doctor with no real substance, although the doctor complained that he had trouble getting paid. Phelps recommended to Mother a referral to COMCARE so she could obtain her therapy there. Mother declined, saying she was comfortable with Dr. Donaldson and did not feel like seeing anybody else. Phelps testified that at prior hearings the interested parties discussed that Mother "either needed to get in to see him [Dr. Donaldson] or get switched so that we could get therapy going and get the case moving."

Phelps testified that, after a permanency staffing meeting in early March 2014, SFCS determined that the case plan goal should be changed from reintegration to adoption. Phelps advised Mother of that change at his March meeting with her. He confirmed that, by the time of the termination hearing, Mother had been aware for approximately 6 months that her parental rights were in jeopardy. Phelps recalled writing a court report in April 2014 recommending that there be a termination of parental rights because of Mother's lack of follow-through on individual therapy, her drug use, her unstable home life in leaving and then going back to P.M., and the fact that the children had been out of the home for 18 months. The children had been in the same foster home

10

since October 2013 and had established a bond with those foster parents. Phelps did say that no difficulties arose during several supervised and unsupervised visits the children had with Mother and P.M., although the foster parents relayed that the children resisted attending the visits and acted up after the visits. Phelps left SFCS at the end of April 2014 and had no further involvement in the case.

Mother testified that she had recently moved into her grandmother's home and had been living with her for 2 1/2 weeks. She acknowledged that prior to that recent move she had been living with P.M. at his place but moved out when the water and electricity were turned off. She described her several moves over the recent years, stating that she had occasionally stayed with friends.

Mother said she had been employed with Johnson Controls for 3 months and, before that, had maintained fairly steady employment, albeit with several employers.

Mother acknowledged that she had made mistakes but contended she had tried to complete her court-ordered tasks. She admitted that she had only attended one therapy session since June 2014, she had not completed individual therapy with anyone, and that she had recently broken promises that she would pay the $10 or $12 HopeNet required to provide her therapy. She also admitted she did not have a current driver's license and had been arrested within the last month for driving without a license. She contended that she needed to drive to get to work. However, she acknowledged that driving without a license was a violation of her criminal probation. When asked what would happen if she was arrested for driving without a license when the children were with her, she said family would come and get them. She did admit, though, that such an experience could be traumatizing for the children.

Mother testified that she was not taking any medication even though it had been prescribed to her for depression. She admitted using marijuana in January 2014 as

11

medication because she was stressed. She also told the court that she had memory issues but had not sought medical attention for them because she "don't wanna nobody playing with my brain." She was unable to explain why she did not just get her medication from COMCARE. Mother partly blamed her recent financial difficulties on DFS, with some justification. From roughly May through August 2014, the State obtained $759 in child support via a garnishment when Mother should have only been required to pay a total of $100, at the court-ordered rate of $25 per month.

Mother told the court that she wanted to coparent the children with P.M. She claimed she and P.M. had not been in a romantic relationship for 8 months. Mother acknowledged, though, that she had moved in and out of P.M.'s home several times in the last 8 months and that she did not tell her SFCS worker where she was living. Mother admitted that the children were removed from the home because of the beating P.M. had inflicted on N.J., but she did not believe that it was her fault that the children were in State custody for 2 years. She had great difficulty recognizing that the beating P.M. inflicted on N.J. and the resulting injuries constituted abuse, even to the point of refusing to answer questions about the subject at the termination hearing. Only under threat of contempt after conferring with her attorney did she admit that the beating was beyond discipline and was in fact abuse. Yet she acknowledged that she had remained, at least off and on, with P.M. after the incident. She further acknowledged that she had engaged in little discussion during the few therapy sessions she had attended regarding the abuse.

Jessica Duntz, a reintegration case manager with SFCS, testified that she took over the case involving Z.J. and Z.M. on May 2, 2014. When she received the case, she scheduled two case plan meetings in May but Mother did not attend either meeting. Duntz had worker-parent meetings with Mother on June 25 and July 2, 2014, and reviewed the tasks in the achievement plan with her. Mother did not have any questions about what she was required to do. However, Mother then failed to appear for drug tests scheduled July 8 and July 22, 2014.

Duntz testified that she was still unsure if the parents were a couple. Mother had six residences in 2 years and only recently told her about moving into her grandmother's house. Duntz reported that Mother's progress in completing the tasks in the case plan was minimal, as Mother had not completed medication management or mental health treatment, had ongoing drug usage, and had not completed a budget or transportation plan even though she had several chances to do so. Duntz recommended that Mother's parental rights be terminated due to her lack of stability and the amount of time the children had been in custody.

Ginger Hampton, of SFCS, beginning in January 2014, supervised the family's caseworkers (first Phelps, then Duntz). She explained the process of family reintegration. The initial stage involves "first order change" where the parent essentially just performs what the court orders require. "Second order change" occurs when the parent actually applies what has been learned from completing the first order tasks, making the life of the parent better in order to obtain the return of the child. Mother had not established secondary change in her mental health, drug use because of missed UAs, compliance with the law (Mother had been recently arrested for driving without a license), and relationship stability. Hampton said the children had the stability they needed in their foster home. Continuing to give Mother chances she did not capitalize on kept the children on an emotional roller coaster. Hampton recommended termination, saying "[i]f [Mother] can't commit to [her own mental health] needs, how can she commit to the needs of the children[?]"

John Shirley testified that he was a case worker for SFCS. He supervised the weekly visits the subject children had with Mother and P.M. He stated that he observed a close bond between the children, Mother, and P.M. He did find it odd that halfway through an in-home supervised visit Mother decided she needed a shower and just left the children with him until she finished. In January 2014, Shirley noted that Z.J. did not want to leave at the end of the visits. However, over time Z.J. was no longer upset when the

visits ended. The foster parents then told Shirley in the "past couple of months" that Z.J. did not want to go to the visits. Shirley and the children's driver to the visitations also noted Z.J.'s reluctance. Shirley asked Jantz, Z.J.'s therapist, to see if she could get an explanation. Jantz reported back that Z.J. would not explain, and Shirley could not get an answer from Z.J. either. Recent visits were held at SFCS because in July 2014 there was no electricity at the home Mother and P.M. occasionally shared.

The State and the Guardian ad Litem (GAL) each argued for termination of Mother's rights to the children. The State pointed out Mother's persistent resistance to change in her attitude about the abuse incident, noting that she defended P.M. to COMCARE. Mother refused to address her diagnosed psychological conditions, in spite of numerous court orders and numerous continuances, all to the detriment of the children. The GAL suggested that Mother's continued driving without a license, her evasiveness on the stand, and her flat refusal to answer some questions demonstrated an attitude that Mother was beyond the laws that apply to other people. The GAL wondered why Mother delayed moving into her grandmother's stable home so long when such a move away from the instability with P.M. may have resulted in early reintegration. The GAL argued that this was another indication of poor judgment regarding her children.

Mother's attorney argued that the State's reliance on Mother's failures to abide by court orders to demonstrate unfitness was an attempt to divert the court's attention from facts that showed Mother was not unfit. After all, Mother had been steadily employed, she loved the children and they loved her, she had provided consistent housing, and she was not the one who abused N.J. Counsel argued that "we have misplaced our vision of what is appropriate parenting and substituted in, if we tell you to do something, you better do it or you're gonna lose." P.M.'s counsel argued that, at least for the four-month period when the State garnished too much of Mother's wages, her failure to pay for treatment, medication, and electricity was the State's fault. The State rebutted, having earlier pointed out that Mother never brought the over-garnishment to anyone's attention.

The district court took the case under advisement. Then on September 24, 2014, the court announced its lengthy and thoughtful decision. After stating that it was finding Mother unfit and terminating her parental rights, the court noted that Mother had "aggressively walked out of the courtroom," slamming the door open on her way out. The district court held that the State had proved by clear and convincing evidence the presence of five statutory factors that rendered Mother unfit: (1) conduct toward a child of a physically, emotionally, or sexually cruel or abusive nature under K.S.A. 2014 Supp. 38-2269(b)(2); (2) physical, mental, or emotional abuse or neglect or sexual abuse of a child under K.S.A. 2014 Supp. 38-2269(b)(4); (3) lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child under K.S.A. 2014 Supp. 38-2269(b)(8); (4) failure to assure care of the child in the parental home when able to do so under K.S.A. 2014 Supp. 38-2269(c)(1); and (5) failure to carry out a reasonable plan approved by the court directed toward the integration of the children into the parent's home under K.S.A. 2014 Supp. 38-2269(c)(3).

The district court meticulously detailed the testimony and the documentary evidence it relied on to support its findings regarding Mother's unfitness. It set out similar detail in making its finding that the unfitness was unlikely to change in the foreseeable future. Finally, the court explained its reasoning for its conclusion that termination of Mother's parental rights was in the best interests of the children. The court filed its journal entry terminating the Mother's, and P.M.'s, parental rights on November 10, 2014. Mother filed a timely notice of appeal. P.M.'s rights are not at issue in this appeal.

ANALYSIS

On appeal, Mother contends the State failed to prove by clear and convincing evidence that she was unfit. Since she was not unfit, "there was no condition of unfitness that would be unlikely to change in the foreseeable future" let alone any legal basis to terminate her parental rights.

15

The legislature has recognized that the importance of the rights of parents to raise their children must be tempered, in certain circumstances, by the State's power and duty to protect children from harm caused by the acts or omissions of the parents. K.S.A. 2014 Supp. 38-2269(a) provides that the district court has the power to terminate the rights of a parent, but only if it finds by clear and convincing evidence that a parent is "unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." Clear and convincing evidence is evidence the truth of which is highly probable. *In re B.D.-Y.,* 286 Kan. 686, 705, 187 P.3d 594 (2008).

In termination of parental rights cases the district court, which hears the evidence directly, makes the factual findings. On a parent's appeal from a termination order we do not reweigh the evidence, judge the credibility of the witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. at 705. Rather, we review all of the evidence, in the light most favorable to the State, to determine whether we are convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the parent was unfit and would continue to be so for the foreseeable future. See *B.D.-Y.*, 286 Kan. at 705; *In re K.W.*, 45 Kan. App. 2d 353, Syl. ¶ 1, 246 P.3d 1021 (2011).

In determining whether a parent is unfit, the court must consider the nonexclusive listed factors set out in K.S.A. 2014 Supp. 38-2269(b) and (c). Any one of those several factors, if demonstrated, can provide grounds for the termination of a parent's rights, although termination is not required. K.S.A. 2014 Supp. 38-2269(f). If the court finds that unfitness has been demonstrated, it then considers whether termination of parental rights is in the child's best interests. K.S.A. 2014 Supp. 38-2269(g)(1); *In re K.W.*, 45 Kan. App. 2d 353, Syl. ¶ 2.

As a preliminary matter, the State points out that Mother did not include any of the State's 41 trial exhibits in the record on appeal. It contends that this failure precludes our

16

review. We note that the district court repeatedly referred to the contents of those exhibits to support its findings. The State is correct that an appellant bears the burden of designating a record that establishes a claim of error. Mother therefore had a duty to proffer a complete record on all the matters she asks us to review. See *Kelly v. VinZant*, 287 Kan. 509, 526, 197 P.3d 803 (2008). Here Mother claims that the district court's findings are not supported by clear and convincing evidence, but then she fails to provide us a considerable amount of the very evidence she maintains was insufficient. This clearly disadvantages the State when it attempts to argue that evidence Mother did not include in the record was actually clear and convincing that she was unfit. In a situation like this, the remedy for the incomplete record is that we must presume that the district court acted properly. *State v. Navarro*, 272 Kan. 573, 588, 35 P.3d 802 (2001).

We disagree, though, with the State's contention that the exhibit omissions must be fatal to Mother's appeal. The only effect of those omissions is that, to the extent the district court referred to a specific exhibit to support a finding and that exhibit has been omitted from the record, we will assume that the missing exhibit supports the district court's finding.

The district court first concluded that Mother had engaged in conduct toward a child of a physically, emotionally, or sexually cruel or abusive nature, an unfitness factor under K.S.A. 2014 Supp. 38-2269(b)(2). The court combined that conclusion with its finding that Mother had also engaged in physical, mental, or emotional abuse or neglect or sexual abuse of a child, an unfitness factor under K.S.A. 2014 Supp. 38-2269(b)(4). Its factual basis for those findings was that, inescapably, P.M. had abused N.J. to the extent that he could not even sit down the following day. The court did not believe that Mother did not know of the abuse. Rather, the court concluded that Mother refused to consider the beating as abuse even though it clearly was. Mother defended P.M.'s action by insisting, in spite of the extent of N.J.'s injuries, that the beating was merely discipline. Even at the termination hearing Mother could not bring herself to acknowledge the abuse

for what it was until she faced contempt for refusing to answer questions about it. The court concluded that Mother failed to consider what was done to N.J. as "inappropriate or wrong." The inference from this is that Mother was complicit in P.M.'s abuse of N.J., factors showing unfitness under both K.S.A. 2014 Supp. 38-2269(b)(2) and K.S.A. 2014 Supp. 38-2269(b)(4).

Mother does not specifically attack these findings. She contends that she really did, at least eventually, agree that the beating was abuse. She also argues, inaccurately, that there was no indication of any other abuse of the children. Actually the State alleged in the CINC petition, which Mother did not contest, that N.J. said he had received 10 whoopins from P.M. and also said he received whoopins all of the time. Likewise, R.J. said that she also received whoopins. Finally, although Z.J. did not himself get whoopins, he told the authorities that N.J. and R.J. did.

The district court also determined that the State had met its burden to prove that Mother showed a lack of effort to adjust her circumstances, conduct, or conditions to meet the needs of her children under K.S.A. 2014 Supp. 38-2269(b)(8). Evidence key to this finding included Mother's failure to obtain counseling she obviously needed for her depression and PTSD. The court found persuasive the testimony that Mother's PTSD arose out of the sexual abuse perpetrated on her as a youth and from her own upbringing in the foster care system. The court was troubled by Mother's lack of awareness of her own problems and her failure to address them for the 2 years the case was pending, especially when dealing with her problems was necessary both for her own health and for the return of her children. The district court also was persuaded that Mother's frequent moves were contrary to her children's need for stability. Mother used marijuana to self-medicate, giving her the benefit of the doubt, rather than obtain medication for her conditions. Finally, mother continued to drive without a license, something she had been ordered not to do and something that could result in revocation of her probation.

18

Again, mother does not directly challenge this finding. She contends that she did participate in therapy but was unable to afford all the sessions. However, even though the State over-garnished Mother's paycheck from May through August 2014, she did not explain why she did not get consistent therapy for the other 15 months after the court ordered individual counseling. She did acknowledge her frequent moves but argued that each place she stayed in was appropriate.

The court also found that Mother had failed to assure the care of her children in the parental home when able to do so under K.S.A. 2014 Supp. 38-2269(c)(1). The district court again relied on the proof that N.J. was abused in the home Mother shared with P.M., but she did nothing to assure N.J.'s care or prevent Z.J. from witnessing the abuse.

Mother's limited contest of this finding is, as it was regarding the first two factors' findings, that P.M. committed the abuse and she did nothing wrong.

Finally, the court determined that Mother had failed to carry out a reasonable plan approved by the court directed toward the reintegration of the children into the parent's home under K.S.A. 2014 Supp. 38-2269(c)(3). The court relied on several facts. First, Mother did not undergo the ordered therapy. She did not maintain a stable residence, moving into, out of, back into, and back out of P.M.'s home. She continued to drive without a license although she had been ordered not to do so. That was a great concern: not only could a violation result in a new conviction, it could also result in the revocation of her probation. Finally, Mother used marijuana, an illegal substitute for medication, contrary to the court's orders and jeopardizing her probation.

Mother again does not directly challenge the finding on this factor. She does maintain that the State, DCF, and the social workers were arrayed against her and, basically, attempted to sabotage her efforts to obtain the return of her children.

19

But whether the State met its burden to prove the existence of the district court's enumerated findings regarding the unfitness factors under K.S.A. 2014 Supp. 38-2269(b) and (c) is not actually the gravamen of Mother's appeal. Rather, she contends that, regardless of the proof of any of the enumerated factors, the State did not prove her unfit. She focuses our attention on K.S.A. 2014 Supp. 38-2269(a) and contends that the State's evidence failed to show that she is "unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." She argues that she proved that she was fit to parent her children, was able to care properly for her children, and there was no good reason she would not do so in the future.

Mother essentially argues that the authorities set up an obstacle course of requirements in order to prevent the return of her children. She maintains that the requirements she did not meet have no real bearing on her fitness to parent. The things that determine her fitness are her love for her children, their love for her, her steady employment which allows her to meet the children's physical needs, and her long history of appropriate parenting interrupted only by P.M.'s abuse of N.J.

Mother cites *In re M.M.*, 19 Kan. App. 2d 600, 873 P.2d 1371 (1994), for her proposition that "[l]ess than a substantial failure to comply with the conditions of a reintegration plan or the court's order will not constitute substantial competent evidence to support a termination of parental rights." 19 Kan. App. 2d at 608. She then contends that her failures to comply with the court's orders here were not substantial because the things required of her would not make her a better mother than she already was. At the same time she advances this proposition she complains that DCF/SFCS never attempted to help her comply with orders so she could obtain the return of her children.

We agree, in theory, with Mother's proposition. In fact, K.S.A. 2014 Supp. 38-2269(f) provides: "The existence of any one of the above factors standing alone may, but

20

does not necessarily, establish grounds for termination of parental rights." And even if the court finds that an unfitness factor has been properly proved, the court still must determine whether the proved factors require termination to further the best interests of the child. K.S.A. 2014 Supp. 38-2269(g)(1).

In this case, Mother's failures were substantial and the district court found them so. She needed therapy to deal with the PTSD and depression consequences of her molestation as a youth and her traumatic upbringing in foster care. The ordered therapy may well have resulted in insights that could interrupt Mother's long history of involvement in violence and her misguided tolerance of it in others, especially when that violence is directed at a child. The 4-month window when she was over-garnished does not mitigate the 15 month period remaining when she should have been in treatment. She chose to use marijuana. She chose to drive without a license. She chose to remain with P.M. in spite of the instability that relationship generated when, apparently, she could have moved in with her grandmother and had stability 2 years earlier than she did. We have reviewed the orders Mother failed to comply with and are convinced they were not just busy work or calculated impediments; they were properly made by the court to help Mother generally improve her life and specifically help her regain custody of her children.

Many of Mother's failings had persisted unchanged throughout the 2-year period the children were in DCF custody. The district court's findings here were supported by clear and convincing evidence such that a rational factfinder could have found it highly probable that Mother was unfit and would continue to be so for the foreseeable future. See *In re S.D.*, 41 Kan. App. 2d 780, 790, 204 P.3d 1182 (2009) (noting that "foreseeable future" is measured from the perspective of the child and that courts have found the inability to change in a period of 7 months the "foreseeable future"); *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982) (a parent's past conduct may be used by the court to predict the parent's future conduct).

21

In concluding that Mother's parental rights should be terminated, the district court examined the best interests of the children. The court was persuaded by Duntz' opinion that she would need to see stability in housing, mental health, and employment for 6-8 months before she would feel comfortable recommending reintegration. The court concluded that permanence for the children could not be placed on hold that long, especially when the children had been out of the home for so long and had obtained permanence in their current foster placement.

Because it hears the evidence directly, the district court is in the "best position to [determine] the best interests of the child," and an appellate court cannot overturn the determination without finding an abuse of discretion. *In re K.P.*, 44 Kan. App. 2d 316, 322, 235 P.3d 1255, *rev. denied* October 7, 2010. An abuse of discretion occurs when no reasonable person would agree with the district court or when the court bases its decision on an error of fact or an error of law. *Critchfield Physical Therapy v. The Taranto Group, Inc.*, 293 Kan. 285, 292, 263 P.3d 767 (2011). The district court did not abuse its discretion when it ordered the termination of Mother's parental rights.

Affirmed.