(574 P.2d 982)

No. 49,074

In the Interest of ERIC HAMBELTON, a Minor.

Petition for review denied April 11, 1978.

Opinion filed February 10, 1978.

*Janine D. Hassler,* of Ivan & Earnshaw, of Shawnee Mission, for the appellant, John Hambelton.

*Muriel Andreopoulos,* assistant district attorney, *Curt T. Schneider,* attorney general, and *Nick A. Tomasic,* district attorney, for the appellee.

Before SWINEHART, P.J., FOTH and ABBOTT, JJ.

ABBOTT, J.: This is an appeal from a court order finding the natural father, John Hambelton, to be an unfit person to have the care and custody of his son, Eric Hambelton, and permanently depriving him of parental rights. The issues are the sufficiency of the evidence to support findings of dependency and neglect and of parental unfitness.

Eric Hambelton was born December 12, 1969. Eric's natural parents are Barbara Hambelton and the appellant, John Hambelton. Barbara Hambelton's parental rights were severed on February 4, 1976, and this appeal does not involve her in any manner.

The Hambeltons voluntarily placed Eric with Mr. and Mrs. Paul Glenn when Eric was three weeks old. Eric has continuously lived with the Glenns since that time. The Hambeltons and the Glenns live on the same street in the same trailer court. Eric was placed with the Glenns as the result of a babysitting agreement. The Hambeltons were to compensate the Glenns twenty dollars per week for their services.

The Glenns requested intervention of the juvenile court and a petition to sever parental rights was signed on November 24, 1975, and filed on January 7, 1976. The hearing, which was completed on February 4, 1976, resulted in the mother's parental rights being permanently severed and the father, John Hambelton, being found unfit. No record was made of the hearing and thus no transcript is available. John Hambelton was ordered to present a complete child-care plan by the end of the school

semester. The plan was to include housing, financial and baby-sitting arrangements for Eric. Eric was to be evaluated by the Wyandotte County Mental Health Center. John Hambelton was granted overnight visitation privileges with his son every other weekend and was ordered to pay twenty dollars per week for support. The question of severance of the natural father's parental rights was taken under advisement.

A review hearing was held on June 23, 1976. Substantially the same order was entered which had previously been entered on February 4, 1976, with one exception—John Hambelton was ordered to have no contact with Eric.

A second review hearing was held on August 23, 1976. Eric was ordered to continue therapy at the mental health center and the Glenns and John Hambelton were ordered to participate in therapy. Overnight visitation privileges were again granted to John Hambelton on alternate weekends. The court further ordered "that when, and if, the previous orders have been completed, when Mr. Hambelton obtains a job, and a complete child care plan is submitted, a review hearing will be scheduled." The question of severance was again taken under advisement.

No record was made of any of the proceedings until the final hearing on February 17, 1977. Court unification had taken place by this time and a record was made of the final hearing. At this hearing, the natural father's parental rights were permanently severed and this appeal followed.

Prior to reaching the merits of this case, we are faced with a jurisdictional question. Final judgment was entered on February 17, 1977, and the notice of appeal was not filed until April 11, 1977. The notice of appeal does contain one sentence concerning the failure to file a notice of appeal within thirty days from the entry of judgment that reads, "This notice is pursuant to the Journal Entry of the 1st day of April, 1977, wherein the time for filing a notice of appeal was extended to April 18, 1977." Nothing further appears in the record to explain why the appeal was not filed within thirty days, and the journal entry of April 1, 1977, is not in the record.

The district court has no authority to extend the thirty-day period within which an appeal may be taken *except* that upon a showing of excusable neglect based on a failure of a party to learn of the entry of judgment the district court in any action may

extend the time for appeal not exceeding thirty days from the expiration of the time otherwise allowable. (K.S.A. 60-2103[a].) In the absence of that finding, this court has no jurisdiction to hear an appeal which is not filed within the statutory period.

Inquiry by this court produced a journal entry dated April 1, 1977, that overrules the appellant's motion for a new trial. A timely motion for a new trial suspends the time for appeal until the motion is acted on. (K.S.A. 60-2103[a].) A notice of appeal served and filed within thirty days after the denial of a motion for a new trial is timely. (*Loose v. Brubacher,* 219 Kan. 727, 549 P.2d 991.) Although the lower court's files do not contain a copy of the motion for a new trial, it is obvious the trial judge was aware of the motion and acted on it. On oral argument, appellant's counsel informed the court that her law firm was employed by appellant after the appeal period had expired, and therefore a motion for a new trial was not filed until March 23, 1977. The thirty-day appeal period having expired prior to the motion for a new trial having been filed, this court has no jurisdiction unless the trial judge makes the necessary findings under K.S.A. 60-2103(a). We are informed appellant filed an affidavit stating he did not receive notice until March 18, 1977. The affidavit is not in the record nor the court files.

In the April 1, 1977, journal entry denying appellant's motion for a new trial, the court also found "that due to the question of when the defendant received notice of the court's decision to sever his parental rights . . ." the court would extend the appeal time until April 18, 1977. No specific finding of excusable neglect was made and it is questionable whether the trial court found the appellant had not learned of the entry of judgment. No record of the hearing on the motion for new trial is included.

Counsel for the appellant was given opportunity to brief the jurisdictional question, but has not assisted the court by doing so. In view of the state of the record in this case, the court would be justified in dismissing the case for lack of jurisdiction. However, after carefully reviewing the trial judge's order denying a new trial, we conclude the effect of the trial judge's findings is to say that appellant did not receive notice of the entry of judgment and that his failure to do so was excusable neglect. The trial judge, having in effect made the appropriate findings, had authority to grant an additional thirty days in which to appeal. The appeal

was therefore filed within sixty days of the appealable order thus giving this court jurisdiction to hear the matter.

The record contains a statement of evidence prepared by appellee under Supreme Court Rule 3.04. The statement does not show the approval of the trial judge. Although the rule does not appear to require written approval by the trial judge, good practice would dictate that he do so. No objection is raised by appellant and we therefore assume the statement was so approved.

The burden of proof on the state to establish unfitness is high. This court will not permanently deprive a natural parent of the custody of a minor child unless the parent's unfitness is established by clear and convincing evidence. (*In re Vallimont,* 182 Kan. 334, 338, 321 P.2d 190; *In re Nelson,* 216 Kan. 271, 531 P.2d 48.) In reviewing the evidence, we consider it in the most favorable light to the party who prevailed in the trial court. (*In re Bachelor,* 211 Kan. 879, 880, 508 P.2d 862.)

The Kansas Supreme Court has considered on several occasions what renders a natural parent unfit for custody. In the case of *In re Armentrout,* 207 Kan. 366, pp. 371-2, 485 P.2d 183, the Supreme Court defined "unfit" as meaning, in general, " 'unsuitable, incompetent or not adapted for a particular use or service. As applied to the relation of rational parents to their child, the word usually although not necessarily imports something of moral delinquency. Unsuitability for any reason, apart from moral defects, may render a parent unfit for custody.' " The term "moral delinquency" was not further defined. We would define it as being delinquent in one's habits of life or mode of conduct.

In the case of *Vallimont,* supra, at p. 340, the Supreme Court stated that a parent who neglects or refuses, when able to do so, to provide proper or necessary support or other care necessary for the child's well-being is unfit. The court went further and stated that apart from other moral defects, the incapacity to appreciate and perform the obligations resting upon parents might render a parent unfit.

In this case, the natural father placed his son with a babysitter at three weeks of age. The Glenns have made all the normal parental decisions concerning Eric all of Eric's life. The father was contacted only when the Glenns needed a parental consent form signed for such things as medical treatment and school. The

Glenns were to receive twenty dollars per week for caring for the boy. That sum was not paid regularly.

Most damaging to the father is what occurred after the proceedings were instituted. At the outset, the court found Eric's father unfit, but it did not permanently sever his parental rights. It is obvious the court intended to return Eric to his father as soon as the father affirmatively indicated to the court that he was willing and able to assume parental responsibility. The father was ordered to submit a child-care plan showing housing, financial and babysitting arrangements for Eric and was granted overnight visitation with his son every other weekend. Such a plan was not submitted until the final hearing, despite a second order to do so on August 23, 1976. Then the child-care plan that was submitted was handwritten by the father's court-appointed lawyer on one sheet of yellow legal paper and handed to the judge at the final hearing. The plan, in part, states the father would work from 10:00 p.m. to 6:00 a.m. and would take Eric to a babysitter in South Kansas City, Missouri, on the way to work and pick him up after work at 6:00 the following morning. No evidence was presented as to who would care for Eric while the father slept. Having failed for one year to furnish a child-care plan demonstrates an incapacity to appreciate or assume the obligations of a parent.

The court ordered the father to participate in the treatment Eric was receiving at the mental health clinic. Eric was taken to the mental health clinic forty-eight times by the Glenns. The father did not participate in the therapy, nor did he take or accompany Eric to the mental health clinic. The evidence discloses the father was unemployed and available during most of the period treatment was provided.

Despite the fact the father was receiving social security payments monthly for Eric's benefit as a result of Eric's natural mother being disabled, he did not regularly pay the twenty-dollar weekly payment the court ordered. No payments were made from May of 1976 until after notice was given of the February 17, 1977, hearing to sever parental rights. The father then attempted to pay the past-due amount some three days prior to the hearing. Money was available from the social security payments to make the weekly payments as they fell due. In addition, Eric's father sold a piece of real estate in November of 1976, and those funds were

available for two months without any effort being made to comply with the support order.

Evidence was offered that visitation privileges were not exercised by the father and he did not cancel them in advance. The Glenns testified that only two visits were made between the August hearing and severance of parental rights in February. Those visits were of short duration and occurred in the Glenns' home some four and a half months prior to parental rights being severed.

Evidence was introduced by a qualified expert that Eric was emotionally immature and noticeably infantile. Mrs. Glenn testified that Eric preferred to remain in the house and watch television rather than play with other children.

The trial court gave Eric's father an opportunity to change his habits and to act as a father to his son. During the one-year period the father knew the court was considering severing parental rights, the father showed indifference to the child's welfare and toward the child by his lack of action, a lack of desire to spend time with his son, and his failure to support the boy at a time when funds were available. The court's orders were unable to motivate him to change his course of conduct from what it had been since the child's birth. The father was not maintaining a healthy environment in which Eric could develop normally. To live only a few doors away and have so little contact, when viewed with the other evidence, clearly and convincingly proves the father was unsuitable and incompetent, and that he had not adapted to being a father.

The record reveals clear and convincing evidence of parental unfitness on appellant's part and substantial evidence to support a finding that Eric Hambelton is a dependent and neglected child pursuant to the provisions of K.S.A. 38-802(g) and K.S.A. 38-824(c).

Affirmed.