19 Kan. App. 2d 600 (1994)
873 P.2d 1371
In the Interest of M.M.
No. 70,150
Court of Appeals of Kansas.
Opinion filed May 13, 1994.
Peter Charles Rombold, of Hoover, Schermerhorn, Edwards, Pinaire & Rombold, Chartered, of Junction City, for appellant.
Thomas P. Alongi, assistant county attorney, for appellee.
*601 Michael P. McKone, of McKone, Unruh & Graham, of Junction City, guardian ad litem.
Before PIERRON, P.J., BRAZIL, J., and JOHN E. SANDERS, District Judge, assigned.
BRAZIL, J.:
Dorothy, the natural mother of M.M., d/o/b 9-14-79, appeals the district court's severance of her parental rights under K.S.A. 38-1583. Dorothy argues that the trial court erred in its determination of her unfitness, that the trial court did not evaluate parental fitness as defined by law, and that the court improperly terminated her parental rights without regard to the requirements set forth in K.S.A. 38-1565. We reverse and remand.
In March 1987, Dorothy abandoned M.M. at the home of a teenage neighbor in Missouri. Vicki, half-sister to Dorothy and M.M.'s aunt, took M.M. to live with her family in Kansas. Vicki and her husband Harold S. (guardians) obtained temporary custody of M.M. in April 1987. In May 1987, M.M. was adjudged a child in need of care (CINC).
A motion to sever both parents' rights as to M.M. was denied in April 1988. The guardians obtained permanent physical custody of M.M. in February 1989. At that time, Judge Gradert, since retired, found that a reintegration plan was not viable but did not sever either parent's rights as to M.M.
Although not providing for a reintegration plan, the court's order contained several conditions, including: (1) that Dorothy pay $83 per month in child support to the guardians, (2) that she maintain frequent contact with M.M. through telephone calls and correspondence, (3) that she attend Alcoholics/Narcotics Anonymous (AA) meetings on a regular basis, (4) that she enroll in counseling and parenting classes, and (5) that she not communicate with M.M. regarding changes in M.M.'s living arrangements. The court granted Dorothy visitation one weekend every three months and one month in the summer, provided Dorothy offered proof of sobriety to the guardians. The order was to be reviewed in three years. The order provided no intermediate court supervision; Judge Gradert retired, and Dorothy's attorney withdrew. For all practical purposes, the court's involvement *602 ceased until after the motion to sever parental rights was filed in October 1992.
From 1989 to 1993, Dorothy visited M.M. approximately three times in Kansas. The guardians took M.M. to Dorothy's home in Missouri for visits on several occasions. Dorothy frequently called and wrote to M.M. and paid child support. Dorothy obtained treatment for alcohol abuse in 1987 and 1989 and participated in AA programs and meetings on a continuous basis.
M.M.'s guardian ad litem filed a motion to sever both parents' rights to M.M. in October 1992, and the trial court (Judge Bengtson) subsequently found both parents of M.M. to be unfit pursuant to K.S.A. 38-1583(b)(8) and (c)(2) and severed their rights to M.M.
Dorothy argues that the State failed to make reasonable attempts to reintegrate M.M. into Dorothy's home as required by K.S.A. 38-1565. Dorothy further argues that her parental rights may not be terminated prior to implementation of such a plan and that termination in this situation violates her due process rights.
K.S.A. 38-1565 states, in pertinent part:
"(a) If a child is placed outside the child's home and no plan is made a part of the record of the dispositional hearing, a written plan shall be prepared which provides for reintegration of the child into the child's family or, if reintegration is not a viable alternative, for other placement of a child. If the goal is reintegration into the family, the plan shall include measurable objectives and time schedules for reintegration." (Emphasis added.)
Section (b) outlines the specific duties of the court services officer and foster parents in submitting reports on the child's progress every six months, under a plan submitted pursuant to (a), and requires:
"If the goal of the plan submitted pursuant to subsection (a) is reintegration into the family and the court determines after 18 months from the time such plan is first submitted that progress is inadequate, the court shall hold a hearing ... to determine whether proceedings shall be commenced . .. to terminate the parental rights of either or both parents." (Emphasis added.)
The trial court in February 1989 addressed the requirements of K.S.A. 38-1565, stating that in the 23 months since she abandoned M.M., Dorothy had made only "sporadic and inconsequential" *603 voluntary child support payments and had maintained only "irregular and unsubstantial" contacts with M.M. The court then stated that it was satisfied that it was ready to proceed under K.S.A. 38-1565(c), which provides that the court may evaluate the needs of the child and order proceedings to terminate parental rights, formulate a reintegration plan, or structure an order for alternative placement. The trial court held that reintegration into Dorothy's home was not a viable option and chose to formulate a plan for alternative placement.
The requirements in subsection (b) apply only to a plan formulated pursuant to subsection (a) and provide for a hearing only in the case of a plan for reintegration. In this case, the court found that reintegration was not viable and was proceeding under K.S.A. 38-1565(c).
Dorothy argues that the trial court improperly determined parental unfitness based on the best interests of her child. Dorothy notes the trial court's statement: "Nonetheless the Court finds that its resolution of the case comes down to one thing, and one thing only, and that is, the best interest of the child."
"After a child has been adjudicated a child in need of care and the court is considering termination of parental rights, the court shall give primary consideration to the physical, mental, or emotional conditions and needs of the child. The interplay between the child's best interests and parental rights is the difficult balancing task the court must perform when deciding whether or not to terminate parental rights." In re S.M.Q., 247 Kan. 231, 240, 796 P.2d 543 (1990).
K.S.A. 38-1583 sets out the factors to consider when terminating the parental rights of a parent of a CINC. Subsection (a) requires a finding of unfitness by clear and convincing evidence. Subsections (b) and (c) list factors that can be considered for unfitness. Subsection (d) allows termination based on abandonment or inability to identify or locate a parent, and subsection (e) provides in part: "In considering any of the above factors for terminating the rights of a parent, the court shall give primary consideration to the physical, mental or emotional condition and needs of the child." In the present case, while the trial court did consider 38-1583(b)(8) and (c)(2), we conclude that it erred in finding Dorothy unfit pursuant to the subsections and in finding *604 Dorothy's contacts with M.M. as "incidental" under subsection (c).
On review, the appellate court must analyze whether substantial competent evidence exists in the record to support the trial court's determination of unfitness. In re S.M.Q., 247 Kan. at 240. The evidence must be considered in the light most favorable to the prevailing party below. Wisker v. Hart, 244 Kan. 36, 37, 766 P.2d 168 (1988).
K.S.A. 38-1583(c)(2) provides that if the child is not in the physical custody of the natural parent, the court may consider "failure to maintain regular visitation, contact or communication with the child or with the custodian of the child."
Regarding Dorothy's contacts with M.M., the order makes the following references:
"[C]ontacts between the natural mother and her daughter in the same period of time [February 1989 to June 1992] are not sufficient to be of substance and the Court disregards the same pursuant to K.S.A. 38-1583(c).
"6. The Court find that the natural mother is unfit by reason of her failure to maintain regular visitation, contact or communication with the child pursuant to K.S.A. 38-1583(c)(2).
....
"9.... the Court's decision with respect to the mother is premised onher lack of contact with her daughter in 1987, 1988, 1989, and thereafter."
Vicki and Dorothy testified that Dorothy frequently writes to and calls M.M. (The February 1989 order required that Dorothy maintain frequent contact with M.M. through telephone calls and correspondence.) Vicki testified that Dorothy has visited M.M. in Kansas three times and that Vicki and her husband have taken M.M. to Dorothy's home in Missouri five or six times per year since the February 1989 order. Dorothy testified that she gives the guardians money to help pay for the trips.
There is some evidence that Dorothy did not maintain regular contact with the guardians; however, Dorothy and Vicki testified that their disagreement as to custody of M.M. made communication difficult. Vicki testified that, because of this difficulty, she sought to minimize her contact with Dorothy.
Notwithstanding Dorothy's clear compliance with that portion of the 1989 order regarding contacts, the trial court disregarded these contacts under 38-1583(c) as "incidental." Dorothy argues *605 that the trial court incorrectly disregarded the contacts in light of the definition of "incidental" as set forth in In re Adoption of McMullen, 236 Kan. 348, 691 P.2d 17 (1984). The court in In re McMullen construed language contained in the adoption code at K.S.A. 59-2102(b), stating that incidental means "`casual; of minor importance; insignificant; of little consequence.'" 236 Kan. at 351.
The State and guardian ad litem approve the application of In re McMullen's definition of incidental contacts. They argue, however, that Dorothy's reliance on the facts of adoption cases to prove that her contacts were more than incidental is misplaced.
Without comparing Dorothy's contacts to those set out in adoption cases, it is clear that the letters, phone calls, and sometimes month-long visits with M.M. were not "casual" or "insignificant." The contacts are of great consequence to M.M., who, according to the psychological evaluation, is "clearly attached" to Dorothy. The report stressed that M.M. needed stability in her life, but warned that to completely remove Dorothy from her life would be "quite traumatic."
There is no substantial competent evidence to support the trial court's dismissal of the contacts between Dorothy and M.M. as "incidental" under K.S.A. 38-1583(c) or the finding of unfitness based on 38-1583(c)(2).
K.S.A. 38-1583(b)(8) states that the court may consider "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child."
The references in the order regarding Dorothy's lack of effort to adjust to meet the needs of the child are as follows: "no affirmative steps taken by the mother to begin reintegration" and "failure to adjust her circumstances, conduct or condition to meet the needs of the child."
As already noted, Dorothy had substantially complied with the conditions of the 1989 order. She had provided support, maintained contacts with M.M., continued her participation in AA, maintained employment, and completed a parental training class.
From our reading of the 1989 order, we are not able to determine what steps Dorothy was expected to take toward reintegration because the 1989 order specifically found that a plan for reintegration was not viable and then proceeded to make an *606 alternative plan for M.M.'s placement under K.S.A. 38-1565(c). The court in 1989 apparently wanted to keep open the option of an eventual reintegration plan because it told Dorothy what she had to do in the meantime and then ordered a review in three years. In other words, the court's order implies that a reintegration plan would not be considered for three years, apparently in an effort to put some stability in M.M.'s life.
The only evidence of Dorothy's failure to adjust her circumstances and conduct to meet the needs of M.M. were allegations of a citation for driving under the influence shortly after the February 1989 order and that Dorothy had talked and written to M.M. about coming to live with Dorothy in Missouri and told M.M. to do poorly in school so that she could then come live with her. Dorothy testified that she told M.M. to work hard in school. There was also evidence that talk of moving exacerbated M.M.'s sense of pain and divided loyalty. Admittedly, such actions would be violations of the 1989 order, but when weighing the consequences of Dorothy's loss of parental rights and the traumatic effect such an order would have on M.M, we conclude that this evidence is not sufficient.
The State and the guardian ad litem emphasize the fact that Dorothy did not return to court to request modification of the February 1989 order before or after the expiration of the three-year period. Dorothy testified that she did not know that the three years had passed because she was busy working and staying sober. She also stated that she did not know that she had the right to come back to court to request a modification of the order. Dorothy testified that she thought her attorney would contact her when it was time to return to court. Dorothy's counsel withdrew after the February 1989 order was entered.
The State and the guardian ad litem argue that Dorothy failed to adjust her circumstances because she did not move to Kansas to be near M.M. Dorothy testified that she did not move closer to M.M. because it would have been too painful to watch Vicki raising her child. Dorothy further testified that she was afraid that this upsetting situation might threaten her sobriety. The February 1989 order did not require Dorothy to move to Kansas, and considering all the evidence in this case, the argument of the State and guardian ad litem is without merit.
*607 The State and the guardian ad litem contend that Dorothy has not maintained gainful employment. This argument is not entirely supported in the record. Dorothy testified that she has worked fairly continuously since 1987. She admitted that she has been terminated once for being late to work. Dorothy has paid child support since 1989.
A parent has a fundamental liberty interest in maintaining a familial relationship with his or her child. In re Cooper, 230 Kan. 57, 631 P.2d 632 (1981); In re J.L.D., 14 Kan. App.2d 487, 490, 794 P.2d 319 (1990). Under K.S.A. 38-1583, a court must find a parent unfit before it may sever his or her parental rights. In re J.G., 12 Kan. App.2d 44, 51, 734 P.2d 1195, rev. denied 241 Kan. 838 (1987). Proof of unfitness must be by clear and convincing evidence. K.S.A. 38-1583(a).
This court considered the term "unfit" in In re J.G., 12 Kan. App..2d at 51-52 (quoting In re Hambelton, 2 Kan. App.2d 68, 71, 574 P.2d 982, rev. denied 225 Kan. 844 [1978]):
"`The Kansas Supreme Court has considered on several occasions what renders a natural parent unfit for custody. In the case of In re Armentrout, 207 Kan. 366, pp. 371-2, 485 P.2d 183, the Supreme Court defined "unfit" as meaning, in general, "`"unsuitable, incompetent or not adapted for a particular use of service. As applied to the relation of rational parents to their child, the word usually although not necessarily imports something of moral delinquency. Unsuitability for any reason, apart from moral defects, may render a parent unfit for custody."'" The term "moral delinquency" was not further defined. We would define it as being delinquent in one's habits of life or mode of conduct.
"`In the case of [In re Vallimont, 182 Kan. 334, 340, 321 P.2d 190 (1958)], the Supreme Court stated that a parent who neglects or refuses, when able to do so, to provide proper or necessary support or other care necessary for the child's well-being is unfit. The court went further and stated that apart from other moral defects, the incapacity to appreciate and perform the obligations resting upon parents might render a parent unfit.'"
As noted previously, it is a difficult task balancing the interplay between the child's best interests and parental rights. In re S.M.Q., 247 Kan. at 240. However, in this case, considering the lack of substantial competent evidence of unfitness and the potential harmful effects to M.M. if Dorothy's parental rights are severed, our balancing is somewhat less difficult.
The trial court's only findings of Dorothy's unfitness were her lack of contacts with M.M., her failure to take steps to begin *608 reintegration, and her failure to adjust her circumstances and conduct to meet the needs of M.M. Less than a substantial failure to comply with the conditions of a reintegration plan or a court's order will not constitute substantial competent evidence to support a termination of parental rights. We have addressed these issues and have found no substantial competent evidence to support those findings.
This is a case of a CINC proceeding that fell through the cracks. It began in 1987 when M.M., then seven, was abandoned by Dorothy. The guardians obtained temporary custody, and M.M. was found to be a CINC. Some 23 months after M.M. was abandoned, the court determined that reintegration with M.M.'s natural parents was not viable under K.S.A. 38-1565 and proceeded with an alternative plan of placement under K.S.A. 38-1565(c), which provides that the court "may order commencement of proceedings pursuant to this code to terminate the parental rights of either or both parents or may order ... a new plan for ... reintegration, or an alternative plan for the child's placement." The court left the custody with the guardians, refused to terminate the parental rights of either parent, set forth a plan to be followed by the natural parents, and ordered a review of the order in three years. Unfortunately, there was no continuing court supervision or review provided to determine what progress was being made. Judge Gradert retired, Dorothy's attorney withdrew, and Judge Bengtson did not become involved until after the motion to sever parental rights was filed in late 1992.
We have discussed above what occurred from the February 1989 hearing until the termination hearing in April 1993. By the time of the hearing, M.M. was almost 14 years old and she had been living with the guardians for over 6 years. What was a difficult situation in 1989 was even worse in 1993, as evidenced in the recommendations in M.M.'s psychological evaluation stressing that the court's order should be as permanent as possible and then stating that the contacts between Dorothy and M.M. not be discontinued if Dorothy's parental rights were severed.
In retrospect, it might have been better for M.M. if the court had terminated parental rights in 1989. However, because of the time that has lapsed and the relationship that M.M. has now developed with Dorothy and with the guardians, her separation *609 from either her mother or the guardians would undoubtedly be detrimental to M.M.
M.M.'s evaluation states that if M.M.'s contact with her mother is cut off it "is likely to be quite traumatic," and she "will continue to have a longing for her mother and probably never fully feel comfortable where she is living."
In less time than has lapsed since the 1989 hearing, M.M. will reach the age of majority. Whether Dorothy can acquire custody of M.M. in the meantime should be determined as quickly as is reasonably possible. This requires the court to first consider the viability of a reintegration plan. But if at all possible, any permanent placement order should provide for reasonable visitation by the noncustodial parties in this action, i.e., Dorothy or the guardians.
While the scope of the proceedings on remand is in the discretion of the trial court, we would hope that it would include an evaluation of Dorothy; a home study of her home; and a consideration of the recommendations of Pawnee Mental Health Services, specifically the involvement of M.M., Dorothy, and the guardians in family therapy.
Reversed and remanded with directions.