NOT DESIGNATED FOR PUBLICATION

Nos. 114,910
114,911
114,912
114,914

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of J.M.B.G., Year of Birth 2001, a Male;
A.M.G., Year of Birth 2007, a Female;
C.E.G., Year of Birth 2009, a Male; and
A.S.B.G., Year of Birth 2001, a Male.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; ROBB W. RUMSEY, judge. Opinion filed August 5, 2016. Affirmed.

*Laura E. Poschen*, of Ward Law Offices, LLC, of Wichita, for appellant natural father.

*Julie A. Koon*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before HILL, P.J., PIERRON AND GARDNER, JJ.

*Per Curiam*: D.G., the natural father of J.M.B.G., A.M.G., C.E.G., and A.S.B.G., appeals from the district court's order terminating his parental rights to all four minor children. He argues that (1) insufficient evidence supports the district court's finding that his unfitness as a parent was unlikely to change in the foreseeable future and (2) the district court erred by holding that termination of his parental rights was in the children's best interests. Finding no error, we affirm.

1

Because Father's appeal focuses on the sufficiency of the evidence presented to the court and the progress he made throughout the proceedings, a detailed recitation of the facts helps with comprehension of the case. In addition, since this appeal challenges only the termination of Father's parental rights, we focus on the facts relevant to Father, including facts regarding Mother only as they are pertinent to the termination of Father's parental rights.

On May 22, 2013, at approximately 9 a.m., police conducted a welfare check at the home of D.G. (Father), R.G. (Mother), and their four children: J.M.B.G., born in 2001; A.M.G., born in 2007; C.E.G., born in 2009; and A.S.B.G., born in 2010. When Mother did not answer repeated knocking at the door and officers saw a toddler standing inside, the officers entered the home, where they saw soiled diapers and human feces on the floor, saw rotting food in the refrigerator and on the kitchen counter, saw dirty dishes and dirty clothing, and smelled rotting food and urine. Mother later described the conditions as "extremely substandard and filthy." A.S.B.G. and C.E.G. were in the house; A.S.B.G. was nude except for a wet diaper and C.E.G. was nude. Mother had been in a back bedroom when police knocked and Father was out of the house returning J.M.B.G. to school after the school had sent J.M.B.G. home to bathe and change his clothes because he smelled like urine. A.M.G. was also at school at the time.

Police took A.S.B.G. and C.E.G. into protective custody and took A.S.B.G. to a hospital, where he was treated for eczema. Social workers who completed a safety assessment on C.E.G. and A.S.B.G. found both children nonverbal, dirty, and smelling of urine. The other two children were later taken into protective custody as well. Both parents were charged with four counts of endangering a child, but they entered into plea agreements under which they pled guilty to two counts each and received probation.

As a result of these events, the State filed a petition on May 24, 2013, to have the children adjudicated children in need of care (CINC). The parents waived their rights to

2

an evidentiary hearing, did not dispute the allegations in the CINC petition, and pled no contest to the adjudication. Accordingly, the district court adjudicated the children as CINC. The district court judge informed the parents: "Get the house cleaned up, that's—I mean, I'm not going to tell you that's the only order. There's other orders you've got to comply with. But if you can get that house in good enough shape, I want to send these kids home while we work some of these orders." The children remained in the custody of the Kansas Department for Children and Families (DCF).

In the early fall of 2013, the children had monitored visits with the parents, but there was concern about the home still being cluttered and unkempt, so the visits were restricted for a few weeks until the parents could meet the minimal standards of cleanliness. At a permanency hearing in October 2013, the district court approved a proposed permanency plan with the goal of reintegration, but it ordered the children to remain in DCF custody after the State expressed its concern that the condition of the house had not improved since the children had left. The court also ordered Father to participate in individual therapy, complete a medication assessment, and comply with all recommendations.

At the next permanency hearing in December 2013, the State acknowledged that the parents had made significant progress and had cleaned the house, completed a parenting class, begun individual therapy, and were about to begin family therapy. The State also noted that C.E.G. had been diagnosed as autistic and J.M.B.G. had a provisional diagnosis of Asperger's Syndrome, which would pose additional challenges for Mother and Father if the children returned to live with them. The district court again found reasonable efforts were being made toward reintegration and ordered the State to submit a reintegration plan with the intent of "get[ting] these kids back home as soon as possible."

3

In January 2014, Elizabeth Schimmel, a family support worker with Saint Francis Community Services, began working with the family. Schimmel was concerned about moving forward with the court-ordered reintegration plan because when she visited the house in January, it was very cluttered and chaotic, the children seemed out of control, and Mother and Father were unable to redirect the children. Also, Schimmel felt that Mother and Father were minimizing a prior report of inappropriate contact between J.M.B.G. and A.M.G.

For example, at one point, Schimmel went to the home and found J.M.B.G. and A.M.G. playing together, unsupervised, in a bedroom, despite the fact that they were not supposed to be left unsupervised and alone. She stated that "the kitchen was cluttered, there were bags of trash everywhere, there was food all over, not just the table surface but also the floor. There was concern with the dog just kind of being all over the place. It was rather chaotic at that point." Within a week or so of her visit to the home, Schimmel and the case worker decided to resume monitored visits—as opposed to unsupervised visitation—in order to better assess the situation.

At a permanency hearing on February 14, 2014, the district court accepted documents from the State that showed that the house was sometimes clean and sometimes not and there were times the children were not properly monitored. Although the State informed the court that it still believed that "overall things are better than they were when this case started," it noted that the family's therapist and case workers still expressed concern over whether there was adequate structure in the family and whether the house was consistently clean. The State reported Schimmel's concern about J.M.B.G. and A.M.G. being alone together and informed the court that they had resumed monitored visitation.

Case workers had also reported that Mother often slept during the visits and Father played computer games with J.M.B.G. while the other children played by themselves.

4

The State asked the court to again order Father to participate in individual therapy, as it had discovered that even though the parents had told their case worker that they were on a waiting list for individual therapy, the therapist's office said the parents had been discharged because they no longer wanted services. At the State's request, the court approved a modified reintegration plan that was still moving toward reintegration, but more slowly than before.

The next month, the court noted at the permanency hearing that evidence showed the family was complying with the court orders and their therapist had recommended gradual reintegration. The report also noted that the "home meets minimal standards and children all seem to have problems." The State agreed with the reports, characterizing the situation as one in which "for every step forward it seems like there's problems, too." Yet, the State believed reintegration was still viable. The court agreed, noting the tasks the parents had completed and telling Father specifically: "[I]t appears that there are—really, it looks like, sir, you've got about two more things that you need to do"—an assessment of Father's interaction with the children and a budgeting and nutrition class.

By the end of April 2014, visits were still monitored; Schimmel testified that the parents struggled with providing appropriate structure during visits and with developing safety plans. When Mother lost her job in April 2014, Schimmel requested budget sheets and information about their financial plan to pay bills and utilities going forward. She did not receive the material.

In June 2014, during a monitored visit, Schimmel saw C.E.G. biting a chunk of foam out of an exposed portion of the sofa; when neither parent tried to stop him, Schimmel had to step in, redirect him, and get the foam out of his mouth. That same month, at the family therapist's request, Schimmel attended in-home family therapy to help address concerns about a lack of parenting, lack of follow through, and concerns about C.E.G. and A.S.B.G. acting out toward their parents and siblings. During the visit,

5

Schimmel saw the parents take a toy that C.E.G. was playing with and give it to A.S.B.G. when A.S.B.G. kept trying to take it from C.E.G.

When Schimmel returned during another visit, A.S.B.G. "had bites all over him" and Mother said she had been watching him play in an ant pile outside. The parents also told her that they had watched C.E.G. trying to catch and pinch bees in the backyard. On June 20, C.E.G.'s foster parent reported to Schimmel that when he returned from a visit, he had slept for several hours and they could not wake him; the foster parent was concerned C.E.G. had ingested something he shouldn't have. Accordingly, before the next scheduled visit, Schimmel and the case worker did a surprise walk-through of the home and found medicine bottles, knives, cleaning supplies, and eye drops accessible to children.

Schimmel created a safety plan with the parents to ensure that these items would be locked up out of the children's reach. Schimmel later reported that at a meeting that same day, A.S.B.G. hit Mother, slapped her in the face, and tried to bite her, and the children were jumping around, spinning in chairs, and "were just all over the place." Schimmel believed the parents had no control over the children. Another time, Schimmel was picking the children up at the end of a visit and saw A.S.B.G. crawling on the floor; when he began to put dog food into his mouth, Schimmel had to stop him because the parents were occupied with C.E.G.

Nevertheless, the parents followed the safety plan, so in late July or August Schimmel and the family therapist decided to allow unsupervised visits and weekend overnight visits by two of the children at a time. A permanency hearing in September 2014 revealed that the home met "minimum standards," the family was involved in family therapy, and home visits were about to be expanded to include overnights. The prosecutor stated: "[I]t's kind of a mixed bag. I think everybody's really trying hard to make this thing work. I think they're receiving the maximum amount of services they

6

possibly could." The guardian ad litem was very concerned about hazardous items being accessible to the children, and he saw no excuse for the fact that these conditions still existed at the home. The court found Mother and Father's progress toward reintegration was adequate and ordered the children to remain in DCF custody and Mother and Father to comply with their therapists' recommendations.

When weekend visits started, however, the foster parents began reporting that the children returned dirty, smelling of urine, and unbathed. In October 2014, A.M.G. returned from a visit and told her foster parents that there were lice at her parents' home. The following week, C.E.G. was sent home from school because he had lice. In mid-October, all four children spent the night with Mother and Father. After that weekend, the foster families reported that J.M.B.G. had returned on Sunday in the same clothes he was wearing when he was dropped off on Friday, C.E.G. came back in clothing that was several sizes too small, A.S.B.G. was in clothing several sizes too large, and C.E.G. and A.S.B.G. smelled like urine. Schimmel and the case worker met with Mother and Father again to discuss those concerns and continued to encourage them to keep the home clean.

Around that time, an extended family member emailed Schimmel expressing concerns that the utilities at the home would be shut off in the near future. After obtaining releases from the parents, Schimmel learned that the water and gas were in danger of being shut off and, by the time Schimmel met with the parents, the electricity had been shut off; the parents had not asked for any assistance with the utility bills. This time, the parents completed the requested budget sheet and followed up getting assistance to have their utilities turned back on.

To address the concerns from the weekend visit, Schimmel and the parents developed a plan for better communication between the parents and to determine who was going to bathe the children at least twice during weekend visits. They also created a plan to encourage J.M.B.G. to shower and use hygiene products, as well as to keep the

boys' clothing separate so there would be no confusion when dressing them. For several weeks following the creation of these plans, the children returned from visits bathed.

The next permanency hearing was on December 5, 2014, and the district court noted that Father had been inconsistent in attending therapy and noncompliant with his medication management. In addition, Father was trying to reintegrate two additional children from a previous relationship, which could mean six children total in the home. The State noted that the therapists continued to recommend reintegration, but the State believed that there was "a very high probability of failure . . . if we were to send these kids home at this point." The guardian ad litem expressed his continuing concern that the parents could not seem to manage basic concepts like keeping their children clean. The district court judge noted that it had been 18 months since the case began as a concern about the home environment and, at this point, the situation was "a little better but not a lot better, we've got some things improved and some things that are falling away." Thus, the court held that the reintegration plan was still appropriate, reintegration remained a viable goal, that extraordinary efforts at integration had been made, and that out-of-home placement remained most appropriate.

In January 2015, overnight visits continued. A.S.B.G. and C.E.G. lived in the home during the school week, and J.M.B.G. and A.M.G. stayed in the home from Friday evenings until Sundays. After 3 weeks of this arrangement, C.E.G.'s school did an intake with DCF for C.E.G. because of concerns about behaviors that had started since he began being at home during the week. C.E.G. was urinating on the classroom floor, taking his pants off in the classroom, and using an iPad inappropriately.

J.M.B.G. and A.M.G. separately told Schimmel that there was not enough food in the home and that they were not bathing during visits. J.M.B.G. also reported that he was not getting his medication during visits. After these allegations, Schimmel and the case worker went to talk with the parents. Around that time, Schimmel learned that the parents

8

were being evicted for nonpayment of rent. Schimmel, the case worker, and other staff involved decided to go back to just overnight weekend visits to see if that helped with the children's behaviors.

According to Mother's later testimony, in February 2015, she had an interaction with Father in which he screamed in her face, pushed furniture around, tried to convince her to admit herself to a "mental asylum," told her that everything that had happened was her fault, and threatened to get an order of protection against her for himself and the children. Although he screamed at her, Father did not hit Mother. Mother reported the incident to the police, and she moved into a shelter on February 9. Shortly thereafter, the parents were evicted from their home for failure to pay rent.

The next permanency hearing occurred on March 26, 2015. By this time, Mother and Father were no longer in a relationship, so the court appointed them separate attorneys. The State informed the court that case workers had changed the case plan goal to adoption and the State intended to file a motion to terminate. On April 17, 2015, the State filed a motion for a finding of parental unfitness and termination of parental rights. The State served Mother and Father with the motion in open court on April 23, 2015.

The termination trial began on August 10, 2015. At the time of trial, Mother and Father's divorce was final. The State stipulated that in the fall of 2013, Mother and Father successfully completed a protective parenting class and in November 2013, they both completed a 4-6 week series of parenting classes through the Kansas Children's Service League. The parties waived opening arguments and the State called Mother as its first witness.

Relevant to Father, Mother admitted that for at least 7 years there had been "issues involving the cleanliness of [their] home." For example, in 2007, while they were living in Montgomery, Alabama, Mother was in the Air Force and she and Father had an

agreement that he would take care of the household and the children—only J.M.B.G. and A.M.G. were born at the time—and she would focus on the military. Yet Mother's commanding officers had initiated an investigation regarding the condition of their home and suggested to her that the condition of their home could lead to the removal of the children. Ultimately, the children were not removed from the home, but the concerns that caused that investigation were similar to the ones in 2013 that caused the children's removal—their home was dirty and not suitable for young children. In 2010, Mother was honorably discharged from the military. She testified that her superior officer told her that they were afraid she would be deployed and the children would have to be removed from the home if she was not there to oversee things because Father did not properly clean the home.

Similarly, in April 2012, someone had called DCF and reported there were dangerous items accessible to the children, so a DCF worker came to the home. Mother testified that after the visit, the DCF worker said she did not see anything to be concerned about at the time. Mother also stated that prior to the day of the police welfare check in May 2013, the school had on occasions contacted Father to pick J.M.B.G. up and bring him home due to his hygiene. Mother testified that her understanding was that the children were not always reasonably clean when they went to school, but she was often at work when the children got ready and went to school, so she did not personally know their condition. On other occasions, J.M.B.G. and A.M.G. came home from school in different clothes than they went to school wearing because the clothes they had arrived in were too dirty.

Mother conceded that the condition of their home in May 2013 when the children were removed warranted their removal. She acknowledged that there was food sitting out in the kitchen that could have been rotting and that C.E.G. was nude when officers arrived. According to Mother, C.E.G. "was going through a stripping phase." Mother also testified that Father had been diagnosed with bipolar disorder and "possibly

10

schizophrenia." She did not think Father could adapt his parenting style and behaviors to best suit J.M.B.G.'s needs.

After Mother's testimony, the State called Father. The court admitted into evidence and took judicial notice of a petition for a protection from stalking order filed by Mother against Father. The State also admitted into evidence a certified copy of the criminal case file involving Father. Father testified that, at the time of trial, he lived at two places, working on the plumbing at his mother's home and staying there sometimes, but also staying with friends at another location as well. He stated that he was looking for permanent housing, but he was having difficulty obtaining housing assistance because of the prior eviction. Father suggested that he could reintegrate with the children at his mother's home, but the "plumbing situation would make that difficult." In May 2015, Father had relinquished his parental rights to two teenage girls from a previous relationship.

At the time of the trial, Father was taking medication for migraines and another medication—an antidepressant—"[t]o even out the effects of the" migraine medication. He had not worked since 2002, and he received Social Security Disability Income because of a disability caused by a traumatic brain injury. Father was able to work part time, but he became agitated and panicky if he was overly stressed. He explained that he would panic if he had to do "twenty different things and [was] doing it for an exceedingly [prolonged] amount of time." Father felt that his disability might partially explain the condition of the home and the children's lack of hygiene.

In addition, Father stated that he had received several different mental health diagnoses from several different psychiatric practitioners. He admitted to sometimes feeling a lack of motivation and leaving things undone and at other times feeling euphoric and going days without sleep. He said his most recent episode was in March 2015, that he had been diagnosed by several therapists and psychiatrists with bipolar disorder, and that

11

his earliest diagnosis was schizophrenia but that diagnosis had later changed. He did not believe, however, that his mental health conditions were a contributing factor to the condition of the home or the children's hygiene issues.

As Father understood it, in May 2013, he and Mother were both responsible for household chores. Mother worked full-time and Father was not working outside the home. When asked if he did not have enough time to keep the house and children clean, Father explained that the situation was one that "happened in a short span of time right before they had shown up" and that before May 2013, the house had been clean. Yet Father then testified that the problems with the conditions of the home went back to before 2007. He stated that in 2005 their landlord had complained about the smell in their house. They later learned a person who lived in the apartment below them had died, apparently causing the smell. Father claimed that he and Mother had consistently provided an appropriate environment for their children that was not dirty; he considered it "cluttered."

Father testified that he had completed two evaluations in July 2013 that had resulted in a recommendation that he attend individual therapy. He began individual therapy at the Mental Health Association (MHA) and "tried to attend consistently," but hekept getting juggled from therapist to therapist as therapists left MHA. Father testified that he attended regularly but missed three appointments because the therapist he had been seeing "had left to go pursue school and did not let them know." MHA then dropped him from services but when it figured out what had happened, he resumed therapy.

Father disagreed with the State's assertion that he had cancelled or simply not shown up to 25 of 33 scheduled appointments. He insisted that he had switched to Family Consultation Services (FCS) in July or August 2014 because his MHA therapists kept changing the dates of his appointments. He believed that any missed appointments at MHA probably occurred while he was receiving services from FCS, and he asserted that

he had been consistently receiving services since August 2014. Father testified that at the time of trial, he was still attending therapy at FCS and was continuing medicine management through a medical clinic. He had noticed his agitation level was lower and his health had significantly improved from the time when his children were removed. Father stated that he was better able to determine which things he needed to worry about and which he did not. He also stated that his mental health providers approved of his decision to divorce Mother.

Father also explained his understanding of the apparent history, prior to this case, of a lack of hygiene with his children. Regarding the school's contentions prior to May 2013 that the children had come to school dirty, Father claimed that on the morning the police removed the children, J.M.B.G. did not smell like urine when he left for school. He also explained that the reason the children had occasionally been sent home from school in different clothes was because they would have accidents at school and wet their pants. Father recalled an incident on May 13 when the school called to ask permission to wash A.M.G.'s coat; Father said the coat "probably reeked" because A.M.G. left her coat on the loveseat, which was a place C.E.G. hid dirty diapers when he took them off.

Father also explained that the school gave A.M.G. a new shirt to wear on one occasion because the school mistakenly insisted her shirt was dirty and once because a boy at school had "messed up her shirt." He admitted that the school had brushed A.M.G.'s hair because it was matted, but he stated that "[t]hey did not like how the way her hair was," and insisted that it had "nothing to do with hygiene." Regarding the April 2012 interaction with DCF about which Mother had testified, Father testified that he was not at the house at that time. Then he testified that he probably *was* the person who met with DCF, but he did not recall. He also claimed to be unaware that DCF had investigated his home at that time. Father testified that he might not remember because of his memory problems, but that he usually only had trouble remembering "insignificant things," like birthdays, sending an email, schedules, daily activities, etc.

13

Regarding the proceedings of the instant case, Father stated that his understanding was that the four children at issue here were removed from his home because of evidence that the house was dirty and unsafe, but Father disagreed with the characterization of his house as unsafe; he stated it was somewhat dirty and that it was "in disarray." Father also disputed police officers' statements that they had found dirty diapers on the floor and rotting food, stating that it was not as bad as the police reports described. He attributed the foul smell reported to a problem he fixed immediately after the children were removed by removing the carpet in two areas of the house, which had become moldy underneath due to moisture from rain. Father testified that at the time the children were removed, he had not noticed any behavioral or developmental concerns with J.M.B.G. or A.M.G. Father acknowledged that C.E.G. took off his clothes and diaper and would eat small pieces of paper or other small things and A.S.B.G. "had a speech problem," but Father thought he would grow out of it, as Father had when he was a child. None of the children were receiving services for behavioral or developmental issues.

Father believed that the reason the overnight unsupervised visits with the children stopped was because "they had an issue with the bills" and because someone alleged that J.M.B.G. was "inappropriate" with A.M.G. Father was unsure, though, because there were at least two separate occasions on which the visitations became more restricted. In October 2014, Father believed that the visits had become more restricted because their electricity had been shut off. Visits were also restricted when Father and Mother were being evicted from their home and because of concerns that the children were not properly receiving their medication and were not properly fed during visits. Father said that there was always sufficient food, but sometimes the children did not want to eat it because, for example, he cooked vegetables that A.M.G. did not want to eat. On cross-examination, he testified that he did not believe the second restriction on visitation was because of cleanliness, but that it was because of concerns that the children were not getting their medication. However, he did not recall the exact reason.

14

Regarding the incident that prompted Mother to move out of the home in February 2015, Father stated that he remembered her leaving and remembered moving some furniture to clean under it, but did not recall getting in Mother's face or shaking furniture. Father asserted that he did not threaten to put Mother into a mental asylum; he asked her to go voluntarily because "she was acting pretty strange about things." According to Father, there was no domestic violence in their relationship. Father then admitted, however, that in February 2015, he had taken out a protection from abuse order against Mother in support of which he had alleged that while she was drunk and on medication, Mother had threatened to kick him, had hit and scratched him, had beaten him with a paddle, and had slapped one of their sons.

Looking to the future, Father testified that he could better provide for the children as a single parent than he did when he was with Mother because he had "lots of friends who are willing to help." Father explained that he could also do better because no one would be there to undo the cleaning he had done—the example he gave was that Mother would not be there to throw the laundry he had washed onto the bed instead of putting it away. He would depend on himself to do 100 percent of the work rather than relying on Mother to take care of part of it. Father believed it was best for the children to be taken care of by family.

When the termination trial resumed on August 11, 2015, the State called Schimmel, who testified generally about her work history and job duties. Schimmel explained her interaction with the family as related above and also shared her concern at seeing the parents using electronics to "babysit" the children instead of interacting with the children themselves. She testified that during several visits she saw Mother sleeping, Father on a laptop computer, A.M.G. "off playing, doing her own thing," J.M.B.G. playing video games, and the youngest two children either watching television or a hand-held electronic device. In addition, when Schimmel arrived at the home, Father was often

trying to clean up or was on his laptop; she never saw him reading or playing with the children.

Schimmel further testified that Father appeared "extremely overwhelmed with the children." She explained that although structure is important for all children, it is especially important for these children because of the autism and Asperger's diagnoses, which require structure even more to succeed. As stated above, C.E.G. had been diagnosed with autism and J.M.B.G. had a provisional diagnosis of Asperger's; Schimmel also testified that A.S.B.G. was on a waiting list at KU Medical Center to rule out an autism diagnosis.

Schimmel disputed Father's testimony about his individual therapy attendance. Her records showed that he was not consistent in attending therapy after his intake with MHA: between July 2013 and February 2014, Father attended only nine appointments. Schimmel further informed the court that at the time of the trial, Father was having weekly monitored visits at Schimmel's office. She felt Father was doing "a decent job" during visits, but she was disappointed when Father provided electronics for the children to play with rather than interacting with them; there were also several visits during which he was dozing off.

In conclusion, Schimmel testified that she did not believe either parent was presently fit to parent the children. She felt that neither had the patience and dedication that parenting would require. Schimmel identified mental health as "a huge, huge factor in why neither of them would be presently able to manage all four children in the home." When asked if there was a likelihood that that would change in the foreseeable future, Schimmel replied that she believed they could make the change for the short term, but that they did not have the ability to sustain it in the long term. In addition, Schimmel could not identify any additional services her agency could try to help reintegrate the family in this case.

16

Schimmel also emphasized that the children needed permanency. J.M.B.G. had become increasingly insecure and unstable over the 6 months prior to trial, wanting to know where his home would be. C.E.G. and A.S.B.G. had improved in "leaps and bounds" in foster care, going from nonverbal, non-potty trained, physically aggressive children to children who ate dinner at a table and greeted Schimmel by name when they saw her. Schimmel felt termination was appropriate at the time of the trial and that it would be in the best interests of the children. Schimmel felt it would be fair to say that the parents had not learned from the prior incidents and tended to repeat their patterns. She believed that, over the long term, it would be "more of the same."

Regarding their ability to be effective single parents, Schimmel testified that due to the extenuating needs of these particular children as well as the issues the parents themselves had, she did not think that single parenting could be successful. On cross-examination, Schimmel expressly disagreed with the question whether, with the parents being divorced and having two separate households, she "believe[d] that there is hope that this dysfunctional partnership wouldn't result in . . . a messy house."

The State also presented testimony from the children's foster parents about their progress in the foster homes and from Amy Otey, the supervisor social worker at Saint Francis. Like Schimmel, Otey testified about her involvement in the case and her conclusion that reintegration was no longer viable because the parents showed the same pattern of moving forward and then falling back. Otey also did not see individual changes that would make a difference in the parents' behavior as single parents. Otey felt it would harm the children to let the parents try one more time as single parents because the children had already waited a long time for permanency. She believed that termination of parental rights was in the best interests of the children. After Otey's testimony, the State rested.

Father testified on his own behalf and admitted into evidence a letter from the City of Wichita Public Housing regarding his progress on obtaining housing. He believed he had a 60 percent chance of receiving independent housing. On the last day of the termination trial—August 12, 2015—Mother relinquished her parental rights to the children.

After accepting Mother's relinquishment, the court heard closing arguments. Then, on the record, the court held that the State had established by clear and convincing evidence that Father was unfit and that his unfitness was unlikely to change in the foreseeable future. Moreover, the court held that Father's mental illness or deficiency was of such a duration and nature as to render him unable to meet children's the ongoing physical, mental, and emotional needs.

The court recounted the long history of social service involvement with the family based on unclean living conditions, even prior to the incident that initiated the current proceedings. The court found the State's efforts to reintegrate the family had been beyond reasonable. In addition, the court held that there had been physical and emotionally abusive conduct toward the children and that their medical needs had not been met. The reasonable efforts the State made had failed to succeed, and Father had failed to adjust his circumstances, conduct, and conditions. Father also failed to carry out the court-approved plan toward reintegrating the children into the home. The court specifically held: "[I]n particular this father has failed in caring for his children."

Because (1) the children had been in out-of-home placement for over 2 years, (2) Father had failed to carry out the court-approved plan, and (3) there was a substantial probability that he would not do so in the near future, the court found that the presumption of unfitness applied which Father had not rebutted. Even more specifically, the district court judge stated:

18

"[J]ust so it's clear, father currently is not fit. He has no place to live. He is financially incapable of caring for the children. But quite frankly, even not considering the financial ability of the father, he has no way to care for these children. He is currently living in a house, trying to fix up another house. He's living with friends, trying to fix up another house. We're two plus years, two years and three months almost into this case and we're no closer. In fact, we're farther away from reintegrating these kids into the parents' home than we were the first day that they were removed from the parents' home."

Accordingly, the court held that the children's physical, mental, and emotional needs would be best served by terminating Father's parental rights. On October 28, 2015, the district court filed its journal entry showing Mother's relinquishment of her parental rights and finding Father unfit and ordering his parental rights terminated. Father timely appealed.

As stated above, Father first argues that there was insufficient evidence to prove that the conduct or condition that rendered him unfit was unlikely to change in the foreseeable future. In essence, he claims that because there was no evidence of his ability to parent as a single parent, the State could not show that his status as a single parent would not cure his unfitness in the foreseeable future. Second, Father argues that termination was not in the children's best interests. In response, the State asserts that the finding of unfitness was supported by clear and convincing evidence and the termination was in the best interests of the children.

*Likelihood that Father's Parental Fitness Would Change in the Foreseeable Future*

"Once [a] child has been adjudicated a child in need of care, 'the court may terminate parental rights . . . when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future.' K.S.A. [2015] Supp. 38-2269(a)." *In re N.A.C.*, 299 Kan. 1100, 1115, 329 P.3d 458 (2014).

19

On appeal, we uphold a termination of parental rights if, after reviewing all of the evidence in the light most favorable to the prevailing party, the district court's factual findings are highly probable, *i.e.*, clear and convincing evidence supports the findings. *In re Adoption of Baby Girl P.*, 291 Kan. 424, 430, 242 P.3d 1168 (2010). We "do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine factual questions. [Citation omitted.]" 291 Kan. at 430-31.

Father asserts that insufficient evidence shows that his unfitness would not change in the foreseeable future, considering the fact that he and Mother were divorced at the time of the termination trial and Father had not yet had the chance to show his ability to be an effective single parent. As Father points out, the reintegration efforts in this case occurred prior to his separation and divorce from Mother.

Father also notes in his testimony at the termination trial that he was seeking suitable housing for himself and the children and that he believed he would parent better as a single parent than he had when he and Mother were married. He testified about the benefits he felt from his ongoing participation in individual therapy and that he felt that his mental health had significantly improved. In addition, Father highlights Schimmel's testimony that "for the most part, most of the time in my interactions with him, he has— he does a decent job." We note, however, that this statement was in response to a question asking Schimmel for her opinion on Father's "ability for sustained attention," not his parenting ability.

Finally, Father points out that one of the district court's bases for finding unfitness was K.S.A. 2015 Supp. 38-2271(a)(6), which allows for a presumption of unfitness if (1) the child has been in a court-ordered, out-of-home placement for 2 years or more; (2) the parent has failed to carry out a court-approved, reasonable reintegration plan; and (3) there is a substantial probability that the parent will not do so in the near future. Father contends that when the State argued this presumption in its closing argument, it referred

20

to "the parents," as did the district court in its ruling from the bench, which in part depended on this presumption. The section of the transcript to which Father cites in support shows the State arguing a presumption of unfitness under K.S.A. 2015 Supp. 38-2271(a)(6), but it does not reflect the State referring to both parents. To the contrary, the State argued:

> "These children have been out of the home for more than two years. There have been court orders in place since the temporary custody hearing back on May 28th, 2013, for them to try to work. I think the plan contained in those court orders and the plan that Saint Francis has worked have been very reasonable. There's no question that [Father] has failed to carry out those plans, and I do not believe there's anything to believe the future is going to be any different." (Emphasis added.)

Similarly, although the district court judge referred to both parents throughout his oral ruling, he clarified at the end of the trial: "As I've addressed this, I've said parents. In this case I directed it only towards father, and it should be—it should be in the journal entry only as to father." Therefore, to the extent that Father is arguing that the district court improperly based its finding of unfitness on Mother's failure to carry out the reintegration plan, his argument fails.

Moreover, considering all the evidence in the light most favorable to the State, even taking into account the testimony Father underscores in his appellate brief, Father's argument is unpersuasive. Although Father testified that he believed he would be a better parent since he was no longer trying to co parent with Mother, the State presented evidence to the contrary. Specifically, Mother testified that she did not think Father could adapt his parenting style to best suit J.M.B.G.'s needs. Schimmel testified that she did not think either parent could make the long term changes necessary to be fit to parent these children. She also testified that during visits that occurred at her office just prior to the termination trial, Father would at times provide electronics for the children to play with rather than interacting with them himself and he would sometimes doze off.

21

Even more specifically, Schimmel testified explicitly that she did not believe that single parenting would be successful because of the needs of these particular children and the issues of these particular parents. When asked whether she believed there was hope that the parents' divorce and resulting separate households would mean in a cleaner home for the children, Schimmel said no. Similarly, Otey testified that she had not seen changes in the parents as individuals which would make a difference in their behavior as single parents. In fact, Otey felt it would harm the children to let the parents try single parenting.

Considering all of the evidence in the light most favorable to the State, the district court's finding that Father's unfitness was unlikely to change in the foreseeable future was highly probable—that is, it was supported by clear and convincing evidence. Thus, Father's argument on this point fails.

*Best Interests of the Children*

Father's second contention is that the district court erred in holding that termination of his parental rights was in the best interests of the children. We review a district court's determination that termination is in a child's best interest for abuse of discretion. See *In re R.S.*, 50 Kan. App. 2d 1105, 1113-16, 336 P.3d 903 (2014). A district court abuses its discretion when it bases a decision on a legal or factual error or when it takes an action with which no reasonable person would agree. 50 Kan. App. 2d at 1116.

K.S.A. 2015 Supp. 38-2269(g)(1) provides that, in making the best-interests determination, "the court shall give primary consideration to the physical, mental and emotional health of the child. If the physical, mental or emotional needs of the child would best be served by termination of parental rights, the court shall so order."

22

"In so doing, the court must weigh the benefits of permanency for the children without the presence of their parent against the continued presence of the parent and the attendant issues created for the children's lives. In making such a determination, we believe the court must consider the nature and strength of the relationships between children and parent and the trauma that may be caused to the children by termination, weighing these considerations against a further delay in permanency for the children." *In re K.R.*, 43 Kan. App. 2d 891, 904, 233 P.3d 746 (2010).

Father focuses on the strength of the bond between him and his children, noting especially that he was still participating in visitation with his children during the termination trial and that the district court judge, after terminating his rights, ordered that he be allowed a final visit with the children. No one disputes that there was a bond between Father and his children or that Father loved his children. In fact, the State acknowledged that bond during closing argument. Father, however, argues that the strength of this bond, in light of his efforts to obtain housing and reintegrate with his family, means that terminating his parental rights was not in his children's best interests.

Perhaps to highlight the seriousness of an order terminating parental rights, Father cites to *In re M.M.*, 19 Kan. App. 2d 600, 605-09, 873 P.2d 1371 (1994), in which this court reversed the termination of parental rights after holding: (1) The mother in that case had not substantially failed to comply with court orders and (2) the only evidence of the mother's failure to adjust her circumstances and conduct to meet her child's needs were allegations of two potential violations of court orders. Father emphasizes the *In re M.M.* court's conclusion that "when weighing the consequences of [the mother's] loss of parental rights and the traumatic effect [a termination] order would have on M.M., . . . this evidence is not sufficient." 19 Kan. App. 2d at 606. The court held that to support a termination of parental rights, competent evidence must show a *substantial* failure to comply with a reintegration plan or court order. 19 Kan. App. 2d at 608.

*In re M.M.*'s relevance here is questionable. First, the controlling statutes in *In re M.M.* were a prior version of the statutes that control here and the portions in issue did not address the best-interests considerations. Second, it appears that the challenge in *In re M.M.* was to the finding of parental unfitness, not to a best-interests determination. See 19 Kan. App. 2d at 603. Third, unlike the mother in *In re M.M.*, Father had 2 years' worth of continuing difficulty complying with the court's orders and the reintegration plan. Moreover, Father does not explicitly explain the importance of *In re M.M.* But to the extent that *In re M.M.* acknowledges the serious impact of terminating parental rights, that is still of utmost importance in current termination caselaw.

Kansas appellate courts have long recognized the value of a bond between a parent and his or her child. See, *e.g.*, *State ex rel., Secretary of SRS v. Bohrer*, 286 Kan. 898, 915, 189 P.3d 1157 (2008) ("'[T]he termination of parental rights is an extremely serious matter.'"); *In re R.S.*, 50 Kan. App. 2d at 1106 (stating same sentiment); *In re Adoption of I.H.H.-L.*, 45 Kan. App. 2d 684, 689, 251 P.3d 651 ("The termination of parental rights in Kansas is a serious and permanent legal step that severs natural parental bonds forever.") *rev. denied* 292 Kan. 964 (2011). Nevertheless, even keeping in mind the gravity of the situation, the district court here did not abuse its discretion in finding that termination of Father's parental rights was in the children's best interests. Father fails to take into consideration the factors we must consider in addition to the relationship between parent and child: any detriment to the physical, mental, or emotional health of a child if parental rights are not terminated as well as the benefits of permanency. See K.S.A. 2015 Supp. 38-2269(g)(1); *In re K.R.*, 43 Kan. App. 2d at 904.

Schimmel explicitly testified that the children needed permanency and that termination of parental rights and the resulting permanency would be in the children's best interests. J.M.B.G. had become increasingly insecure over the 6 months prior to the trial, wanting to know where his home would be. With regards to the other children, Schimmel explained that they needed stability and structure and not to remain unsure of

where their home would be. Otey also testified that the children had waited long enough for permanency and "they need to have solid ground under their feet that they can trust."

The children's foster parents testified about the children's vast behavioral improvements since they had left Mother and Father's home and even since the overnight and extended visits with Mother and Father ceased. For example, by the time of the termination trial, after being with the foster family for a little over 1 year, J.M.B.G. no longer bit other people and he put away his own clothing, His foster mother testified that since the overnight visits with his parents ended, J.M.B.G. was not so angry and had "gotten a lot better."

Similarly, A.M.G.'s foster mother, who had A.M.G. in her home for over 2 years, stated that while A.M.G. was still having visits at the family home, there were incidents at school in which A.M.G. was physically aggressive with other children. C.E.G. and A.S.B.G.'s foster mother testified that, since being with her, C.E.G. had "really flourished," but during the time when the children were going on overnight visits to the parents' home, C.E.G. regressed back to behaviors of taking off all of his clothes, biting other people, being aggressive, and being overly clingy. A.S.B.G. would often come back from visits more aggressive and scratch other people. At the time of the termination trial, however, A.S.B.G. and C.E.G.'s foster mother stated they were "doing fabulous[ly]."

In light of all of this testimony and the fact that the proceedings had been ongoing for more than 2 years, the district court did not abuse its discretion in finding that termination of Father's parental rights and the resulting permanency that termination would afford the children was in the children's best interests.

Affirmed.

25