NOT DESIGNATED FOR PUBLICATION

Nos. 117,152
117,153
117,154

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of J.T.K., L.S.K., and H.O.K.,
Minor Children.

MEMORANDUM OPINION

Appeal from Miami District Court; AMY L. HARTH, judge. Opinion filed October 13, 2017.
Affirmed.

*Glen E. Sharp, II*, of Paola, for appellant mother.

*Julia Leth-Perez*, assistant county attorney, *Elizabeth Sweeney-Reeder*, county attorney, and *John
L. Domoney*, guardian ad litem, for appellee.

Before ATCHESON, P.J., BUSER, J., and BURGESS, S.J.

PER CURIAM:  R.K. (Mother) adopted J.T.K. (YOB 2003), L.S.K. (YOB 2004),
and H.O.K. (YOB 2005). On March 14, 2016, the State of Kansas filed a motion asking
the District Court of Miami County to find Mother unfit as a parent and for termination of
her parental rights. After a hearing, the district court found Mother was unfit under
K.S.A. 2016 Supp. 38-2269(b)(2), (4), (6), (7), and (8), and subsequently terminated her
parental rights. Mother appeals. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

J.T.K., L.S.K., and H.O.K. (the Children) are the adopted children of Mother. Mother adopted L.S.K. and H.O.K. in May 2010, and adopted J.T.K. in September 2011.

The family has a tumultuous history. In September 2011, the Johnson County Department for Children and Families (DCF) received reports about unnatural bruising to both J.T.K. and L.S.K. DCF workers noted H.O.K. also had bruising on her face and remarked that the Children appeared to have been coached to give certain answers. For instance, when DCF workers asked L.S.K. about the bruises on her back, she responded that she did not remember what she was supposed to say. J.T.K. reminded her she was supposed to say, "I don't want to talk about that." At the Children's Mercy Suspected Child Abuse and Neglect Clinic (SCAN), medical personnel found bruising and belt marks on the Children's backs and buttocks. Thereafter, the State filed three child in need of care (CINC) petitions and removed the Children from Mother's home. Mother later pled guilty to three charges of endangering a child (Johnson County case No. 12CR00212). Eventually, the Children and Mother reintegrated.

In September 2015, Jennifer Stockard, a Child Protection Specialist for DCF, responded to reports that H.O.K. had a suspicious bruise on her arm. Stockard made contact with the Children at a neighbor's house and "noticed that [they] seemed small and thin." When asked about H.O.K.'s bruise, the Children "became tearful and were trembling and all refused to talk to [Stockard] unless [Mother] was present."

On January 6, 2016, Stockard and Detective Timothy Brown of the Miami County Sheriff's Department visited Mother's home to inquire about a video recording recently received by local law enforcement. The video recording was from 2013 and showed Mother slapping both H.O.K. and J.T.K., berating them with words like "stupid" and "idiot," and telling J.T.K. she would "beat his fucking ass."

2

After Detective Brown played the video for Mother, she told him "it was a stressful time . . . when that video was recorded." Both Detective Brown and Stockard asked if they could see the children. Mother responded that "she had to go to work," and "wanted to schedule a time . . . to talk with [the Children] maybe the next day." Eventually, however, she relented and showed the Children to Brown and Stockard. Stockard noted the Children's appearance "was pretty stark. They were very small. They seemed very, very thin. Their eyes were sunken in." Stockard then asked to see the Children's arms, legs, and backs, and observed numerous bruises on the Children's backs and faces, and also noticed J.T.K. had "purple feet." At this point, Brown and Stockard placed the Children in police protective custody.

The Children were transported to Children's Mercy South and tended to by Kristen Smith, a pediatric nurse practitioner. Smith testified that H.O.K. appeared malnourished and had numerous bruises on her back, hands, forearms, and face. L.S.K. appeared pale, had abrasions on her face and shoulders, a scar below her chin, cracked and dry skin, and scars on her feet. J.T.K. was "very pale" and thin, "had a bruise and swelling to his right cheek, a scar on his forehead," swelling on the right side of his head, and scabs and redness on his back, hands, and forearms. In addition, J.T.K.'s feet were frostbitten, red and purple, and had blisters on the tops and bottoms of both feet.

J.T.K. explained to Smith that he sustained the injuries to his feet "after Christmas, [when] he was running away from [Mother] outside in the snow and didn't have any shoes on his feet." J.T.K. also told Smith he received the bruises on his back when he fell out of a truck located in Mother's yard. Mother provided a similar explanation for J.T.K.'s bruises to Detective Brown. However, when Detective Brown went to view the truck, he noted that "[f]ull weeds . . . had . . . grown up [around the truck and] the snow wasn't disturbed." Elsewhere on the property, Detective Brown observed "footprints in the snow" with "the outlines of a toe or toes."

3

The State filed a CINC petition for all three Children on January 8, 2016, based on K.S.A. 2016 Supp. 38-2202(d)(1), (3), and (11). On March 14, 2016, the State filed a motion asking the district court to find Mother unfit and to terminate her parental rights. After a multi-day hearing, the district court found Mother unfit under K.S.A. 2016 Supp. 38-2269 and terminated her parental rights.

In addition to Smith, Dr. Amanda Knapp, a certified pediatrician at Children's Mercy Hospital in Kansas City and a graduate of the University of Nebraska Medical Center, also testified at the termination hearing. Dr. Knapp was working in the emergency room at Children's Mercy on January 6, 2016, and assumed care for the Children after Smith. Dr. Knapp testified she had particular concerns about J.T.K. Specifically, J.T.K.'s feet

> "had open wounds. There were multiple blisters. They appeared to be frostbitten. . . . [S]everal of [the blisters] looked infected, like there was some surrounding redness and swelling. They were very, very tender to the touch. . . . [J.T.K.] couldn't walk on them because he was in pain. He was walking on his heels in order to avoid stepping on his feet."

Dr. Knapp also testified J.T.K. "started vomiting and his blood sugar was low [and he] wasn't really tolerating fluids." On this basis, J.T.K. was admitted to the hospital for further care.

The State also presented Dr. Mary Moffat, a pediatrician and graduate of the Royal College of Surgeons in Dublin, Ireland, who completed her pediatrics residence at the Cleveland Clinic Foundation in Cleveland, Ohio, and specialized in child abuse pediatrics at Children's Mercy Hospital in Kansas City. Dr. Moffat worked in the SCAN clinic at Children's Mercy and examined each of the Children on January 8, 2016—and again on February 4, 2016.

4

Dr. Moffat testified at length about the condition of J.T.K. During her initial examination and follow-up, Dr. Moffat noted J.T.K. had "multiplanar scars, meaning different scars in different locations and planes of the body [and] pattern scars as well." Based on these injuries, Dr. Moffat diagnosed J.T.K. with "child physical abuse" because "the volume distribution and some patterned marks that we found on [J.T.K.] on both dates [were] beyond what one would expect to see from accidental injury. . . ." Dr. Moffat continued, "[W]hen you see a patterned scar, you're worried automatically for inflicted injury, because accidental injury tends not to leave a patterned scar."

Regarding the frostbite to J.T.K.'s feet, Dr. Moffat testified that

"some of his wounds were open and infected. So left untreated, [the] infection could get worse at that level. If frostbite is severe enough, it could lead to gangrene. . . . [Y]ou worry that with severe infection, it can move into the bloodstream and cause infection in the blood or be transported and cause infection elsewhere in the body."

Based in particular on the condition of J.T.K.'s feet, Dr. Moffat diagnosed him with "medical neglect," stating, "[W]e felt that the wounds on his feet . . . looked dirty. The wounds looked infected. And . . . proper medical care should have been sought for these wounds."

Dr. Moffat rendered similar diagnoses for both H.O.K. and L.S.K., noting H.O.K.'s feet "resembled [J.T.K.'s] but not as severe" and that her face and back had peculiar scrapes and bruises. L.S.K. also had unusual bruising and scarring.

Dr. Moffat also diagnosed each of the Children with nutritional neglect, explaining:

"So when we meet a child and they're underweight, one possible explanation is not taking enough food in. You don't know that right away. You put them into an

5

environment in which they have adequate access and intake of food and you wait to see what happens with their growth. And if they demonstrate weight gain with provision of adequate nutrition, then you discover that nutritional neglect is the most likely explanation for them being underweight when they've gained [weight] with adequate or provisional nutrition."

To this end, Dr. Moffat testified that J.T.K. (who was 12 years old in January 2016) weighed 69.34 pounds when he was admitted to the hospital on January 6. Nearly a month later, on February 4, he weighed 83.33 pounds—an increase of about 14 pounds. During that same month, J.T.K. had grown 4.5 centimeters (or 1.77 inches). Dr. Moffat remarked, "[Y]ou would not typically see a child who is a growing child gain weight under normal circumstances that quickly," and noted that J.T.K.'s growth was "a rather lot of linear growth for a month's time." Similarly, L.S.K., who weighed 59 pounds on January 6, had gained 5.17 pounds by February 4. And, H.O.K., who weighed 53 pounds on January 6, had gained 5.5 pounds by February 4. Of H.O.K.'s gains, Dr. Moffat said, "I wouldn't expect her to gain 5.5 pounds in a month. So it was a great weight gain under normal circumstances for a child who is 10 years three months."

Ultimately, Dr. Moffat recommended against the Children returning to Mother's care.

After his removal from Mother's home, J.T.K. attended regular therapy sessions at Kids TLC. Wendy Bennett, a therapist at Kids TLC, conducted 29 individual therapy sessions with J.T.K. between March 2016 and June 2016. During these sessions, J.T.K. shared several "bad memories." One such instance recounted by J.T.K. was when Mother "saw a piece of candy in his pocket, sticking out of his pocket, that he took without permission, and . . . he had to stand in the corner all night." When Bennett asked what would happen if he got tired, J.T.K. replied, "'[Mother] would put me in a cold shower and she does that a lot.'" On another occasion, Mother made J.T.K. "walk to the barn

6

naked." And, another time, Mother "fixed a big pot of oatmeal and made him eat it. When he couldn't eat it and he threw it up, she made him eat the throw up."

J.T.K. recounted these same incidents to Sarah Ellis, a care facilitator at Kids TLC. Ellis further testified that J.T.K. told her

"a story about being grounded from wearing shoes and it was snowing out and he would have to go out in the snow without his shoes on. He said when he got into the house, he was unable to warm up and would sometimes be required to take cold showers, and he wasn't always given a towel."

J.T.K. also disclosed that he received the marks on his back when Mother "hit him with a John Wayne dress-up belt on his back and tummy."

At the hearing, Mother readily admitted she had "popped [J.T.K.] in the mouth," but denied ever hurting him. Mother categorically denied all other allegations of mistreatment and appeared to suggest that J.T.K. fabricated the stories he told about her abusive conduct. As to the frostbite on J.T.K.'s feet, Mother maintained that J.T.K. complained about them only once, on January 5, 2016—the day before the Children were removed. Before then, Mother simply told J.T.K. that he "needed to put antibiotic ointment on [his feet], and he needed to put to put a Band-Aid on [them]." Mother confessed she did not think J.T.K.'s injury "was as bad as it was."

Regarding the Children's weight, Mother explained they were on a vegan diet and attributed J.T.K.'s inability to gain weight to his ADHD medication. Mother claimed that a local physician told her the Children were not malnourished.

After hearing the above evidence, the district judge found Mother unfit under K.S.A. 2016 Supp. 38-2269(b)(2) and (b)(4), stating:

7

"[J.T.K.] suffered significant frostbite to his feet while in [Mother's] care. Further, [L.S.K. and H.O.K.] suffered unexplained injuries while in [Mother's] care. While these injuries—whether these injuries constitute physical abuse is open to interpretation. It is physical abuse to, by [Mother's] admission, pop a child in the mouth. What's disappointing about this behavior is perhaps not the level of injury but how the child might interpret it. What is the purpose of such an act? To belittle the child might be considered mental and/or emotional abuse. Is it to stop the child from talking, to deter further behavior? In any event, however much such an action might be seen as repugnant, it does not based on the facts here constitute physical abuse.

"However, as to [J.T.K.], the Court finds the injuries to his feet constitute physical abuse, and I find the State and the guardian ad litem have met their burden as to this allegation as to [J.T.K.].

"I further find that refusal to treat this injury was in and of itself physically abusive and cruel. While [J.T.K.] did not display any outward signs of pain in front of [Mother], upon being taken into custody, he disclosed his discomfort when he arrived at Children's Mercy in the safety of DCF while walking into the building with Miss Stockard."

Mother timely filed this appeal.

THE DISTRICT COURT'S FINDING THAT MOTHER WAS UNFIT UNDER
K.S.A. 2016 SUPP. 38-2269 WAS SUPPORTED BY CLEAR AND CONVINCING EVIDENCE

On appeal, Mother contends the district court erroneously determined she was unfit as a parent. Specifically, Mother claims she "was never given the opportunity to reintegrate with her children."

A district court may terminate parental rights if it finds "by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2016 Supp. 38-2269(a). Appellate courts apply

this clear and convincing standard when reviewing a district court's decision to terminate parental rights. K.S.A. 2016 Supp. 38-2269(a).

> "When this court reviews a district court's termination of parental rights, we consider whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the parent's right should be terminated. [Citation omitted.]" *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011).

In making this determination, appellate courts do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

When considering whether a parent is unfit under K.S.A. 2016 Supp. 38-2269(b), Kansas courts consider a list of nine nonexclusive factors. The existence of any one of these factors may—but does not necessarily—establish grounds for termination of parental rights. K.S.A. 2016 Supp. 38-2269(f). Here, the district court found Mother unfit based on the following factors:

> "(2) conduct toward a child of a physically, emotionally or sexually cruel or abusive nature;
> . . . .
> "(4) physical, mental or emotional abuse or neglect or sexual abuse of a child;
> . . . .
> "(6) unexplained injury or death of another child or stepchild of the parent or any child in the care of the parent at the time of injury or death;
> "(7) failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family; [and]
> "(8) lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child." K.S.A. 2016 Supp. 38-2269(b).

9

The facts of this case clearly show that the district court's decision was supported by clear and convincing evidence.

*Mother was unfit under K.S.A. 2016 Supp. 38-2269(b)(2)—conduct toward a child of a physically, emotionally, or sexually cruel or abusive nature; and K.S.A. 2016 Supp. 38-2269(b)(4)—physical, mental, or emotional abuse or neglect or sexual abuse of a child.*

Mother contends she "had not physically disciplined her children since successfully completing her 2011 case plan and reintegrating with her children." Beyond this single phrase, Mother's brief is virtually silent regarding the district court's findings for this particular factor. Arguably then, Mother has abandoned this issue on appeal. See *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 645, 294 P.3d 287 (2013) (a point raised incidentally in a brief and not argued therein is deemed abandoned); *University of Kan. Hosp. Auth. v. Board of Comm'rs of Unified Gov't*, 301 Kan. 993, 1001, 348 P.3d 602 (2015) (failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority or in the face of contrary authority is akin to failing to brief the issue). In all events, the record clearly supports the district court's finding for this factor.

In her brief, Mother repeats the same assertions and excuses she made in the district court with the expectation of a different outcome. A different result is not proper here, as the evidence fully supports the district court's findings regarding K.S.A. 2016 Supp. 38-2269(b)(2) and (b)(4).

The punishments Mother administered to J.T.K. were undoubtedly cruel and abusive, as was her refusal to treat J.T.K.'s frostbitten feet. Indeed, Mother's failure to seek medical attention for J.T.K. is even more significant when one considers the serious health risks that might have befallen J.T.K. had his infected, frostbitten feet remained untreated. Although the district court failed to address the Children's nutritional neglect, this testimony clearly supports the State's position. Dr. Moffat's testimony about the

10

children's weight at the time of the first examination and their rapid weight gains from January 6, 2016, to February 4, 2016, firmly established neglect on Mother's part. The district court had clear and convincing evidence to find Mother unfit under K.S.A. 2016 Supp. 22-69(b)(2) and (b)(4).

*Mother was unfit under K.S.A. 2016 Supp. 38-2269(b)(6)—unexplained injury or death of another child or stepchild of the parent or any child in the care of the parent at the time of injury or death.*

As stated above, Mother fails to address this particular factor anywhere in her brief and, thus, has essentially abandoned this issue on appeal. *Friedman*, 296 Kan. at 645. Nevertheless, the district court reviewed the evidence documented above and found:

> "[I]t is clear that [J.T.K.'s] feet sustained frostbite while in his [Mother's] care. All three children had marks, bruises and scars which the SCAN team at Children's Mercy found to be inconsistent with normal childhood injuries. The injuries to [H.O.K. and L.S.K.], including scratches and bruises, were unexplained. The State and the guardian ad litem have met their burden as to this allegation."

This conclusion is supported by clear and convincing evidence. As the district court noted, each of the Children had scars, scratches, and bruises on their backs, arms, faces, and other suspicious areas. Mother provided no explanation for any of these injuries other than that J.T.K. had fallen off a truck in her yard. Detective Brown's observations of the area surrounding this truck did not support Mother's story. Ultimately, the fact that each of the Children had unexplained injuries was sufficient to satisfy K.S.A. 2016 Supp. 38-2269(b)(6).

*Mother was unfit under K.S.A. 2016 Supp. 38-2269(b)(7)—failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family.*

This is the only factor for which Mother presents a distinct argument, claiming in her brief that the State "did not submit evidence that . . . Mother had not substantially completed her case plan." The district court addressed this particular issue below when it explained its findings for this factor:

"These children after their adoption by [Mother] were the subjects of [CINC] petitions in Johnson County, Kansas, in 2011. As a result of the underlying allegations of those petitions, [Mother] was convicted of child endangerment in Johnson County. The evidence at our trial was uncontroverted that [Mother] successfully completed a case plan and those children were released from the custody of the State and returned to her. The investigation of that 2011 matter led to the children being seen at Children's Mercy and are the reason for Dr. Moffat's diagnosis history of child abuse.

"In the present cases, while [Mother] did work toward addressing some issues, for example, she met with a nutritionist in April . . . 2016 to address the dietary needs of the children, it appears DCF made no concerted effort to return the children to her. This was, of course, because the State announced early in the case it intended to file a motion to terminate [Mother's] parental rights. So while it is true in this case DCF made no effort to rehabilitate the family, in the previous [CINC] case, it would appear efforts were made but that while the children were reintegrated with [Mother], it is clear those efforts did not rehabilitate this family or the children would not have been removed from her home yet again."

In other words, the district court determined that Mother's regression to abusive behavior toward the Children indicated State efforts to rehabilitate the family with prior services had failed.

Mother contests this finding and points to *In re M.M.*, 19 Kan. App. 2d 600, 608, 873 P.2d 1371 (1994), in which this court stated: "Less than a substantial failure to comply with the conditions of a reintegration plan or a court's order will not constitute

12

substantial competent evidence to support a termination of parental rights." Mother analogizes *In re M.M.* to this case, claiming: "In the cases now before the Court, the Mother has substantially complied with her case [plan]."

It is clear from her argument that Mother has missed the essence of the district court's ruling on this particular factor. The simple fact acknowledged by the district court—and not contested by Mother—is that, after the 2011 CINC case and subsequent reintegration of the Children with Mother, the Children were once again removed from Mother's care under similar circumstances. For the purposes of this factor, the district court needed only to determine that efforts by the State to rehabilitate the family had failed. And, viewing the evidence as a whole, it was logical for the district court to conclude that if Mother was the subject of CINC cases in 2011 and 2015, then the State efforts to rehabilitate her relationship with the Children had failed. Thus, there was clear and convincing evidence to find Mother unfit under K.S.A. 2016 Supp. 38-2269(b)(7).

*Mother was unfit under K.S.A. 2016 Supp. 38-2269(b)(8)—lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child.*

Finally, Mother appears to very briefly argue that she did, in fact, make efforts to adjust her circumstances to better care for the Children. The district judge thoroughly disagreed with this contention and found:

> "Looking back on the history of these children while they've been with [Mother], this is the second time these children have been removed from her care. The first was in 2011. It is worth noting that [Mother's] reasoning regarding that removal was [J.T.K.'s] behavior—[J.T.K.'s] behaviors were increasingly difficult to manage, and she was home with the children as it was summer and she was pregnant. She admitted to Detective Stirling she used a belt and spanked . . . the children's bare skin. . . .
>     "During this trial, the State admitted a video recording made in 2013 which again speaks for itself. The abusive tone and language [Mother] used at that time is difficult to

13

hear and even more so to imagine the impact it might have had on a child of tender years. . . .

"We move from 2013 to 2015 when [Mother] testified that [J.T.K.'s] behaviors began to escalate again and now he is being disciplined by being sent into the snow barefoot and injuries he received were left untreated until again the State intervened. In short, it would seem that every two years [Mother's] life spirals out of control and it seems these children pay the price.

"When I consider whether she's adjusted her circumstances to meet the needs of these children . . . I would point out the inconsistency of [Mother's] testimony of being concerned about [J.T.K.'s] weight but not consulting a nutritionist until after the filing of this petition.

"It is clear to me that [Mother] was willing to make very few accommodations or changes to her conduct to meet the needs of these three children."

The evidence already presented supports the district court's findings for this factor. Mother consistently abused and mistreated the Children during the years they lived with her. Indeed, the similarities between this case and the 2011 CINC case show that Mother has made no real effort to change her behavior toward, or treatment of, the Children in any way. Clear and convincing evidence supported the district court's findings for this factor.

Despite a previous significant intervention by the State, Mother's parenting of the Children has remained the same over many years. Based on the duration of Mother's maltreatment of the Children, it is clear that this situation is not likely to change in the foreseeable future. Rather than continuing the distinct possibility that the Children would suffer additional mistreatment, it is also clear that it is in the Children's best interests to order termination of Mother's parental rights. The district court had clear and convincing evidence to find Mother unfit and to terminate her parental rights under K.S.A. 2016 Supp. 38-2269.

Affirmed.

14