NOT DESIGNATED FOR PUBLICATION

No. 119,351

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of B.B.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Marion District Court; MICHAEL F. POWERS, judge. Opinion filed November 9, 2018. Reversed and remanded.

*Anastasia R. Leininger*, of Cornerstone Law Group LLC, of Newton, for appellant natural father.

*Jacqie Spradling*, special prosecutor, for appellee.

Before ARNOLD-BURGER, C.J., GREEN, J., and ROBERT J. FREDERICK, District Judge, assigned.

PER CURIAM: In order to terminate a person's parental rights, a district court must have "clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2017 Supp. 38-2269(a). The district court must also find that termination is in the best interests of the child, giving "primary consideration to the physical, mental or emotional health of the child." K.S.A. 2017 Supp. 38-2269(g)(1). The district court terminated J.B.'s parental rights and J.B. appealed. Because we find that the State failed to present clear and convincing evidence that Father was unfit, we reverse the district court's decision terminating J.B.'s parental rights.

1

FACTUAL AND PROCEDURAL HISTORY

J.B. (Father) and A.B. (Mother) have one child together—B.B., born in 2013. Mother has two other children—C.B., born in 2006, and T.B., born in 2009. Authorities came into contact with the children on December 3, 2014. On that day, a neighbor called the Marion County Sheriff's Office after being unable to wake Mother. Officer Wilma Mueller responded. The three children were in the home. Officer Mueller found marijuana, drug paraphernalia, and prescription medications that were not prescribed to either Mother or her children. Additionally, Officer Mueller observed open containers of alcohol within reach of the children and a partially smoked marijuana cigarette on the dresser in Mother's bedroom. There were also knives throughout the home. This included knives and an ice pick stuck in the door trim in the living room, a knife taped to the wall of Mother's bedroom, a knife stuck in the wall of Mother's bedroom, and knives scattered throughout the home on counters and other surfaces within reach of the children. Officer Mueller reported that the house was unsanitary and unsafe for the children. Officer Mueller arrested Mother and took the children into protective custody. Father lived down the street from Mother's residence. The State filed a petition alleging that the children were in need of care.

Mother and Father both appeared at a hearing on December 10, 2014, and stipulated that the children should remain in the temporary custody of the State. On February 23, 2015, the court issued an order of adjudication finding that the children were in need of care.

The State filed a motion for review and termination on July 31, 2017. The district court held a termination hearing eight months later on March 22, 2018. Mother voluntarily relinquished her parental rights, so the focus of the hearing was on Father and his parental rights regarding B.B.

Father successfully completed many of his case plan tasks. Meagan Waltner, a social worker, was the family's case manager from the inception of the case and she helped Father work through his case plan. As part of his case plan, Father had to maintain stable housing and employment; keep his home clean and safe; and ensure that medications and hazardous items were out of B.B.'s reach. He maintained stable housing and employment. While he kept the inside of his home clean, Waltner was concerned about hazardous items outside of the home discovered the day before the hearing. Waltner believed there were a lot of things that a young child could fall on. There was also an opening on the side of the house covered by a thin, warped piece of wood. Waltner was unsure where the opening led to, but she was concerned that a child could fall there. Another case plan task was that Father had to submit to random drug screens and test negative. While he did test positive for opiates on several occasions, he was on prescribed medications. Waltner was unsure whether the positive results were from his medications or illicit substances. He did not test positive for any other drugs. Father took a drug and alcohol assessment as part of the case plan. Father also had to complete a mental health evaluation and follow any recommendations made. However, he did not receive any recommendations after completing his mental health evaluation. Finally, Father had to take a parenting class where he would address positive discipline and boundaries. Father completed these classes. The parenting classes entailed people going to Father's home, watching him interact with the children, and teaching him skills.

One concern discussed at the termination hearing was an allegation that Father physically abused the children. Jennifer Myers, a social worker for the Kansas Department of Children and Families (DCF), testified as to this concern. She first came into contact with the family in 2013, before the children were adjudicated in need of care. She was assigned to investigate potential abuse of T.B. by Father. After interviewing the children and parents, Myers found that the allegation was unsubstantiated. She had further contact with the family in October 2014 after receiving a report that the children had observed Father physically discipline one of them. Myers referred the family to

3

family preservation services. In February 2016, Myers investigated another report that Father hit T.B. in front of C.B. and that his actions scared C.B. T.B. had marks on his body and reported that Father had hit him with a belt. Again, she found the allegation unsubstantiated. Stacy Rucker, a child protection specialist with the DCF, also investigated an allegation that Father physically abused C.B. in February 2018. C.B. reported that Father and Mother were arguing, and that when C.B. attempted to intervene Father struck him. C.B. had bruises on his arm which Rucker observed. Rucker thought the bruising was consistent with C.B.'s report of abuse. At the time of the hearing, her investigation was ongoing.

Myers explained that unsubstantiated does not necessarily mean that the referrals had no basis. She testified that when investigating allegations she had to either find them substantiated or unsubstantiated. A substantiated finding meant that a person committed abuse and that the person needed to be placed on a central registry. Once on the registry, the person would be prohibited from working, living, or volunteering in a facility with children or vulnerable adults. Thus, an unsubstantiated finding did not necessarily mean there was no abuse, just that the person did not meet the criteria to be placed on the central registry. Myers said that DCF used a clear and convincing standard of proof in determining whether abuse allegations are substantiated or unsubstantiated.

Another concern brought out at the termination hearing was that Father failed to change his parenting style. Waltner opined that despite the various services provided to Mother and Father, there was "still not a big change in the way of thinking, and how they approach parenting." Andrew Bogner, who provided family therapy to Mother, the two older boys, and Father, shared this concern. After seven months, Bogner discharged the family from therapy because he did not believe they were deriving any benefit from his services. His discharge statement said that he had not observed any second order change in the family. He explained that second order change means permanent, positive change as opposed to merely surface level change.

4

Waltner expressed some concern regarding Father's relationship with Mother. She heard reports from the foster parents and the children that Father and Mother argued frequently and that Father had hit Mother in front of the children. Waltner was not sure if the reports were true. But, in January 2016, she asked Father and Mother to complete couples counseling if they intended to remain together. They completed five sessions.

Finally, Waltner was concerned about deterioration in the children's behaviors. From the inception of the case, the goal for the family was reintegration. The family made enough progress that the State initiated the final steps to reintegration in February 2017. By that time, the children lived with their parents for five days a week. But, the progress stopped when the two older children, C.B. and T.B., exhibited concerning behaviors at school. C.B. had tried to choke himself with the arms of his hoodie. He also made suicidal comments. T.B. made suicidal and homicidal comments. Mother told therapists that she did not feel like she could keep the children safe in light of their behaviors. B.B. also showed concerning behaviors. He smeared feces on the wall, refused to listen, and damaged two mattresses at his foster home. B.B.'s daycare kicked him out because he displayed physical aggression towards other children. After the deterioration of the children's' behavior, the State reduced the number of days the children spent with their parents. B.B.'s negative behaviors continued even after the State reduced the time he spent with his parents.

At the conclusion of the hearing, Waltner recommended that Father's parental rights be terminated. She explained her recommendation as follows:

> "[I]t's hard to pinpoint what the actual issues are. When we talk to the parents, nothing's wrong, they haven't done anything, but we continue to get behaviors and allegations from the older children. And I don't know if it's just against them, or if it's, you know, kind of the whole—if there's fighting, if there's violence in the home, I'm not sure. I can't confirm how safe [B.B.] actually will be."

5

Although there were no allegations that Father physically abused B.B., Waltner thought B.B. could become a target if the two older children were removed. She also worried about the conditions outside of Father's home. When asked what harm could result to B.B. if Father maintained his rights, she replied that she did not know but that B.B. would be unable to report if something went wrong. Waltner had not observed any improvement in Father's ability to parent throughout the case, and she could not think of any services that the State had not offered to Father. Waltner thought Father was able to provide for B.B.'s physical, mental, and emotional needs when they were supervised. Her concerns existed where Father had the children without supervision, because that was when the allegations of physical abuse against C.B. and T.B. occurred.

After hearing the evidence, the district court terminated Father's parental rights. The court began by stating that the case was "a little bit different than" other termination of parental rights it had had because it is not usually presented with "a situation in which a party has been able to show that they have completed most of, if not all, of the case plan tasks." However, while Father completed his case plan he had not "demonstrate[d] second order change to reflect that he was able to learn and utilize new techniques to parent his child and step-children." The court found that there were no services available which could help Father improve his ability to parent which had not been attempted. Furthermore, the longer B.B. remained in State custody the worse B.B.'s behavior had become. The court also cited the multiple reports of alleged physical contact with C.B. and T.B. Finally, the court found that Father had "remained married to [Mother] instead of doing what was necessary to meet [B.B.'s] needs."

Father appealed the termination of his parental rights.

ANALYSIS

"Natural parents who have assumed their parental responsibilities have a fundamental right, protected by the United States Constitution and the Kansas Constitution, to raise their children." *In re Adoption of Baby Girl P.*, 291 Kan. 424, 430, 242 P.3d 1168 (2010). "Accordingly, courts have the authority to terminate the parental rights of only those persons found to be irredeemably unfit to care for their children—nothing less will suffice." *In re A.M.*, No. 116,391, 2017 WL 2022704, at *1 (Kan. App. 2017) (unpublished opinion). A district court can only terminate a person's parental rights "when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2017 Supp. 38-2269(a). After making a finding of unfitness, the district court must also find that termination is in the best interests of the child, giving "primary consideration to the physical, mental and emotional health of the child." K.S.A. 2017 Supp. 38-2269(g)(1).

*There was insufficient evidence to support the district court's finding that father was unfit to properly care for his child.*

Father argues that the district court had insufficient evidence to find that he was unfit by reason of conduct or condition which rendered him unable to properly care for B.B.

Kansas appellate courts review a district court's decision to terminate a natural parent's rights for clear and convincing evidence. *In re B.D.-Y.*, 286 Kan. 686, 697, 187 P.3d 594 (2008).

"[W]hen an appellate court reviews a trial court's determination that a child is in need of care, it should consider whether, after review of all the evidence, viewed in the light most

7

favorable to the State, it is convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the child was a [child in need of care]." 286 Kan. at 705.

Although *In re B.D.-Y.* was a child in need of care case, the court expressly stated that its definition also applies to parental rights termination cases. 286 Kan. at 697, 706. In making this determination, an appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. 286 Kan. at 705.

Even when viewing the evidence in the light most favorable to the State, the evidence in this case does not rise to the level of clear and convincing. The court supported its holding with four primary findings. First, Father failed to "demonstrate second order change" in his parenting skills. Second, B.B.'s behavior had deteriorated. Third, there were allegations of physical abuse. And fourth, Father remained married to Mother. The evidence regarding each of these factors, and the reasons why this evidence is insufficient, will be discussed next.

*Father's failure to demonstrate second order change*

The testimony on Father's failure to demonstrate second order change was conclusory and vague. Waltner did not believe that Father had changed his way of thinking or his approach to parenting. But she never explained what about Father's thinking and parenting methods needed to change. Bogner also testified on this point and had a similarly conclusory finding. Even though Bogner spent seven months in therapy with the family he failed to identify a single area in which Father needed to improve. The State never presented evidence about what Father was doing wrong or what he needed to change in order to succeed. To support its case, the State needed to identify specific problems with Father's parenting methods that he was either unable or unwilling to change.

8

In a case we view as analogous to the facts here, a district court terminated a mother's parental rights in part because she "failed to maintain regular visitation, contact, or communication with the child or with the custodian of the child." *In re J.L.*, No. 110,993, 2014 WL 4627604, at *9 (Kan. App. 2014) (unpublished opinion). This is one of the statutory factors that courts can consider in termination proceedings. K.S.A. 2017 Supp. 38-2269(c)(2). The district court admitted that the mother did make regular visits with the children, but that she "'failed to advance beyond simply attending the meeting.'" 2014 WL 4627604, at *9. The mother "had to be redirected at visits, told what not to talk about, and reminded to focus on the needs of the children." 2014 WL 4627604, at *9. This court disagreed with the district court's termination on this basis. It held that the district court appeared to have interpreted the phrase "regular visitation, contact, or communication" to "include[] a specific qualitative element that simply does not appear in the statute." 2014 WL 4627604, at *9; see also *In re A.M.*, No. 116,391, 2017 WL 2022704, at *5 (Kan. App. 2017) (unpublished opinion) ("The district court dismissively discounted [a father's] efforts as merely 'checking off boxes,' apparently imposing some additional—and hidden—standard for true success.").

Here, the district court is also adding an additional element to Father's case plan that the case plan did not include. The case plan required Father to attend parenting classes. He did. If there was something more that he needed to do, the State needed to identify what that was and provide evidence that Father failed to do it.

*Deterioration in B.B.'s behavior*

The district court also relied on the deterioration in B.B.'s behavior. However, the State failed to explain why the deterioration was Father's fault. Instead, it asked the court to assume that the problems were Father's fault because B.B.'s behavior began to change when Father and Mother graduated to five-day visits. The implication in the State's assertion is that Father either caused the negative behavior or lacked the parenting skills

9

to control it. However, B.B.'s behavior did not improve when Father's visits were reduced. B.B. was still exhibiting negative behaviors on the day of the termination hearing despite spending less time with Father. And, B.B. exhibited negative behaviors while living with his foster family. B.B.'s foster mother testified that she had trouble managing B.B.'s behaviors when he was in her care. She actually called Father for help when B.B. was acting up and she believed that Father was helpful. The State did not make the same negative implication about the foster family—that they must have lacked parenting skills because a child under their supervision was acting out—as it did about Father. This is a harmful double standard.

This issue is similar to that in *In re A.M.* There, a district court terminated B.C.'s parental rights to his daughters in part because B.C. was unable to stop their unruly behavior. Supervised visits between B.C. and his daughters "were often a struggle with the girls running up and down the hallways in the building, yelling, throwing toys, and otherwise acting out." 2017 WL 2022704, at *3. The case manager reported that "B.C. was unable to effectively rein in and redirect his daughters' unruly behavior. The unruliness often spilled over to adversely affect the girls' behavior at school the day after the visits." 2017 WL 2022704, at *3. The case manager ultimately stopped the visits. The district court essentially found B.C. unfit because he could not better control his daughters. However, this court found that B.C. should not have been "held wholly and singularly responsible for the problems." 2017 WL 2022704, at *5. It noted that "[d]uring the termination hearing, nobody offered any explanation for the deterioration of the girls' behavior in that environment." 2017 WL 2022704, at *6. Further, "[t]he social worker apparently couldn't get at the cause and couldn't bring about an improvement in their behavior—precisely the sort of issues that presumably ought to be addressed in therapy." 2017 WL 2022704, at *6. The social worker chose to "[fall] back on eliminating the circumstance sparking the problem rather than resolving its underlying cause." 2017 WL 2022704, at *6. This court ended by stating: "B.C. may not have been the ideal parent for

10

A.M. and E.M., particularly as a single head of the household. He might very well fall below average. But as we have said, that is not the standard." 2017 WL 2022704, at *6.

There are a number of reasons B.B.'s behavior could have changed. It may have been because he spent a majority of his life being moved between his parents and foster family. He may have been acting out for attention. He may have been mimicking the behavior of his older siblings. It could be because he was getting older and testing his boundaries. Or it may, as the State asserts, have been because of Father's parenting style. The State failed to provide clear and convincing evidence tying B.B.'s behavior to Father's conduct or condition. Courts cannot just assume that a negative behavior is a parent's fault, especially where there are other potential causes for the behavior. This does not meet the stringent evidentiary standards in place to protect parents' rights. The district court did not err when it noted that B.B.'s behavior began declining when he began five-day visits with his parents, but the legal conclusion the district court drew from this finding is not supported by the evidence.

*Allegations of physical abuse*

Physical abuse of a child is a reason to terminate a person's parental rights. See K.S.A. 2017 Supp. 38-2269(b)(2) and (4). But allegations of physical abuse must be supported by clear and convincing evidence. Here, the State mentioned that there had been three unsubstantiated allegations and one allegation that was currently being investigated.

The first allegation was that in 2013 Father physically abused T.B. There were no additional facts. Because the State failed to present evidence that would tend to either confirm or deny the allegation, it remains just that—an allegation. Allegations alone are not clear and convincing evidence of physical abuse.

11

The second allegation was that Father physically disciplined one of the children. The State did not identify which child was the alleged victim or how Father was alleged to have hurt the child. Even assuming the allegation is true, physical discipline of children is not prohibited in Kansas. Parents are allowed to use corporal punishment as long as it does not rise to the level of being "cruel and inhuman." See K.S.A. 2017 Supp. 21-5602(a)(3).

The third allegation of physical abuse was that Father hit T.B. with a belt and left marks on T.B. Again, there were no additional facts presented that would help the court decide whether this actually occurred. Even if it did occur, the court was without evidence to decide whether Father's actions rose to the level of being abusive.

The final allegation arose in 2018. This allegation was slightly more detailed than the others. C.B. alleged that Father and Mother were fighting and that he put his hands between them. Then, he alleges that Father hit him. There were photos of a bruise on C.B.'s arm. The State failed to conclude its investigation of the allegation before the termination hearing. Instead of presenting facts and testimony, the State only recounted the details of the allegation. "Clear and convincing evidence" is "that which is sufficient to establish that the truth of the facts asserted is 'highly probable.'" *In re B.D.-Y.*, 286 Kan. at 696.While the State asserted facts, it did not present evidence sufficient to establish that the truth of its asserted facts was highly probable. See *In re J.L.*, 2014 WL 4627604, at *6 (refusing to find clear and convincing evidence of abuse where the State presented only unsubstantiated allegations).

The State itself admitted that it uses a clear and convincing standard when investigating claims of physical abuse. Under this standard, it found that all of the allegations against Father were unsubstantiated. Yet, it asked the district court to believe that it presented clear and convincing evidence of physical abuse by Father which would

12

support terminating his parental rights. It was error for the district court to rely on the unsubstantiated allegations in terminating Father's parental rights.

*Father's marriage to Mother*

The final finding made by the district court is that Father was unfit because he remained married to Mother "instead of doing what was necessary to meet [B.B.'s] needs." There was extremely limited testimony on the effect of Father and Mother's marriage on the children. About halfway through the case Waltner told the couple to get counseling if they intended to stay together, but there was no evidence that she recommended that they separate. Father and Mother completed five sessions of counseling. No one testified that Father's marriage to Mother harmed B.B. And, no one told Father that he needed to end his relationship with Mother as a condition of maintaining his parental rights. In fact, the State's suggestion to Father that he attend couples counseling with Mother if they intended to stay together shows that they did not see separation as a necessity. Father even asked Waltner at one point if he would have a better chance of maintaining his parental rights if he left Mother. Waltner told him it was possible but she had "no way of knowing . . . ." It was wrong for the court to punish Father for staying in a relationship when that was not a part of his case plan or a recommendation from the people working on his case.

*Conclusion*

"Less than a substantial failure to comply with the conditions of a reintegration plan or a court's order will not constitute substantial competent evidence to support a termination of parental rights." *In re M.M.*, 19 Kan. App. 2d 600, 608, 873 P.2d 1371 (1994). Everyone agreed that Father substantially complied with his case plan tasks. Father had stable housing and income. He participated in all evaluations, therapy, and classes that the State asked him to complete. He had no criminal history.

13

The district court said that it did not "see anything that has been done that would show that [Father] is in a position to appropriately parent [B.B.] at this time." But the inverse is also true—the State failed to provide clear and convincing evidence that showed Father was not in a position to appropriately parent B.B. It was not Father's burden to provide the evidence in this case, it was the State's. The State failed to meet this burden. While the State may have harbored concerns about what would happen should B.B. return to Father's care, it lacked the concrete evidence necessary to support a finding of unfitness.

Even viewing the evidence in the light most favorable to the State, we are not convinced that a rational fact-finder could have found it highly probable, i.e., by clear and convincing evidence, that J.B. was unfit to parent his child. Accordingly, we reverse the district court's decision terminating Father's parental rights to B.B.

Based on our conclusion, there is no need to consider the court's findings that Father's unfitness was unlikely to change in the foreseeable future or that termination of his parental rights was in B.B.'s best interests.

Reversed and remanded.